STATE OF NORTH CAROLINA EX REL. JAMES G. MARTIN, AS GOVERNOR OF THE STATE OF NORTH CAROLINA AND JAMES G. MARTIN, IN HIS CAPACITY AS A CITIZEN AND GOVERNOR OF THE STATE OF NORTH CAROLINA, PLAINTIFFS v. EDWIN S. PRESTON, JR., HENRY V. BARNETTE, JR., FRANKLIN R. BROWN, ROBERT E. GAINES, AND DONALD STEPHENS, IN THEIR INDIVIDUAL CAPACITIES AS REGULAR SUPERIOR COURT JUDGES AND ON BEHALF OF ALL OTHER SIMILARLY SITUATED SUPERIOR COURT JUDGES, AND THE NORTH CAROLINA STATE BOARD OF ELECTIONS, ORIGINAL DEFENDANTS, AND THE NORTH CAROLINA ASSOCIATION OF BLACK LAWYERS, INTERVENING DEFENDANT

No. 58PA89

(Filed 9 November 1989)

1. **Constitutional Law § 10.2 (NCI3d) — judicial review — deference to legislation**

    Although North Carolina was among the first to recognize the doctrine of judicial review, great deference will be paid to the acts of the Legislature, which is the agent of the people for enacting laws.

    **Am Jur 2d, Constitutional Law §§ 84 et seq.**

2. **Constitutional Law § 2.1 (NCI3d) — North Carolina Constitution — rule of construction**

    Issues concerning the proper construction of the Constitution of North Carolina are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments; where the meaning is clear from the words used, a meaning will not be searched for elsewhere.

    **Am Jur 2d, Constitutional Law §§ 84 et seq.**

3. **Constitutional Law § 1.1 (NCI3d) — North Carolina Constitution — issues finally resolved only by N. C. Supreme Court**

    Issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina can only be answered with finality by the North Carolina Supreme Court, which is not bound by the decisions of federal courts.

    **Am Jur 2d, Constitutional Law §§ 84 et seq.**

4. Elections § 1 (NCI3d)— judicial redistricting—election dates changed—no constitutional violation

In a constitutional challenge to Chapter 509 of the 1987 Session Laws, which created new judicial districts and which delayed election dates to eliminate staggered terms in some districts, the Supreme Court concluded that securing uniformity in the beginning of terms of office for public officials is an adequate purpose to sustain Chapter 509 under the state constitution. Moreover, the General Assembly could reasonably have decided that Chapter 509 was an act providing for the continued compliance with the Voting Rights Act and that this too was a public purpose.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges §§ 10, 15.**

5. Elections § 1 (NCI3d)— judicial redistricting—delayed election dates—no violation of N. C. Constitution

A judicial redistricting which delayed election dates to eliminate staggered terms did not violate Art. IV, § 16 of the North Carolina Constitution because the effect of Chapter 509 did not extend current terms, but created a one-time interim or hiatus between certain terms of office. Since no successors will be elected and qualified at the expiration of the old terms, the incumbent judges will continue to serve, as anticipated by the constitutional provision that judges remain in office until their successors are elected and qualified.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges §§ 10, 15.**

6. Elections § 1 (NCI3d)— judicial redistricting—delayed elections—fundamental right to vote for judges not denied

A judicial redistricting which postponed some judicial elections to eliminate staggered terms did not deny citizens their fundamental right under Art. IV, § 16 of the North Carolina Constitution to vote for judges at the expiration of their eight-year terms of office because the right to vote per se is not a fundamental right under our constitution; the equal right to vote once the right to vote is conferred is fundamental. The North Carolina Constitution sets no specified interval between judicial elections but only requires that superior court judgeships have eight-year terms of office and that elections be often and free.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges §§ 10, 15.**

STATE ex rel. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

7. **Elections § 1 (NCI3d)— judicial redistricting—delayed elections—no denial of right to seek office**

A judicial redistricting which delayed elections in certain districts to eliminate staggered terms did not deny qualified candidates the right to seek office because the right to seek office is a political privilege and not inalienable; the fact that a candidate's aspiration has been thwarted by a non-discriminatory change of law gives him no cause of action.

Am Jur 2d, Elections §§ 4-7, 12-15, 201; Judges § 10.

8. **Elections § 1 (NCI3d)— judicial redistricting—no usurpation of power to make judicial appointments**

The Legislature did not unconstitutionally usurp the governor's authority to make judicial appointments by a judicial redistricting act which also delayed some elections to eliminate staggered terms. The incumbent judges remained in office under the constitutional holdover provision allowing incumbents to continue serving in the interim, and not by the legislative act.

Am Jur 2d, Elections §§ 4-7, 12-15; Judges §§ 10, 11.

9. **Elections § 1 (NCI3d)— judicial redistricting—eight-year judicial term not rendered meaningless**

A judicial redistricting which also postponed certain elections to eliminate staggered terms and multiple districts did not render the eight-year term limitation in the North Carolina Constitution meaningless because it created a one-time delay in certain districts for the reasonable public purpose of eliminating staggered terms.

Am Jur 2d, Elections §§ 4-7, 12-15; Judges §§ 10, 11.

10. **Elections § 1 (NCI3d)— judicial redistricting—delayed elections—not special emolument upon incumbents**

A judicial redistricting which delayed elections in certain judicial districts to eliminate staggered terms did not confer a special emolument upon the incumbents in violation of Art. I, § 32 of the North Carolina Constitution because any benefit to the incumbent judges was incidental and subordinate to the legitimate public benefits obtained by delaying elections for certain judges.

Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.

**11. Elections § 1 (NCI3d) — judicial redistricting — delayed elections — vacancy not created**

A judicial redistricting which delayed some elections to eliminate staggered terms in multi-seat districts did not result in a vacancy in the judgeship held by Robert Gaines, even though his term expired in 1988. Even though the Legislature delayed elections for that office from 1988 to 1990, it acted within its authority and, as Judge Gaines could hold over until a successor was elected and qualified, no vacancy was created.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges §§ 10, 16.**

**12. Elections § 1 (NCI3d) — judicial redistricting — new districts — incumbents appointed — no constitutional violation**

A judicial redistricting which assigned forty incumbent superior court judges to new districts in which they reside was not unconstitutional because the new districts in all cases were comprised of portions of the old districts and a subset of the same voters who nominated or elected the incumbent judges assigned to the new districts. Although the new districts were smaller in size, the voters in the new districts fully participated in all instances in the elections by which the incumbent judges assigned to them were chosen.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.**

**13. Elections § 1 (NCI3d) — judicial redistricting — new districts — appointment of incumbent judges — no violation of separation of powers**

A judicial redistricting in which smaller districts were created from existing districts and incumbent judges assigned to the smaller districts did not amount to appointments of individuals to vacant superior court judgeships in violation of the doctrine of separation of powers because the incumbent judges held over and no vacancies arose.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.**

**14. Elections § 1 (NCI3d) — judicial redistricting — appointment of incumbent judges to new districts**

A judicial redistricting which created new, smaller judicial districts from certain existing districts and which assigned incumbent judges to those new districts did not deny Democratic

STATE EX REL. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

voters residing in the new districts the right to participate in that party's districtwide nomination process.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.**

15. **Elections § 1 (NCI3d) — judicial redistricting — new districts — incumbents appointed — no deprivation of right to run for judgeship**

A judicial redistricting which created new, smaller districts from certain existing districts and which appointed incumbent judges to the new districts did not deprive potential candidates of the right to run for judgeships because there were no vacancies.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.**

16. **Elections § 1 (NCI3d) — judicial redistricting — failure to follow county boundaries — no constitutional violation**

A judicial redistricting which created superior court districts of less than a whole county and in two instances of parts of two counties did not violate the North Carolina Constitution because there is no prohibition against the splitting of counties when creating superior court districts. Although the constitution requires one clerk of superior court per county, the clerk is a county officer while the judge is a state officer and, while the constitution specifically requires that county boundaries be followed in creating legislative districts, the constitution does not require that county boundaries be followed in creating judicial districts.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.**

17. **Elections § 1 (NCI3d) — judicial redistricting — candidates required to reside in new districts**

A judicial redistricting which required those filing a notice of candidacy for superior court judge to reside in the judicial district as it will exist at the time the person would take office if elected was constitutional.

**Am Jur 2d, Elections §§ 4-7, 12-15; Judges § 10.**

ON discretionary review prior to a determination by the Court of Appeals, pursuant to Rule 15(a) of the North Carolina Rules of Appellate Procedure and N.C.G.S. § 7A-31(a), of judgment entered

by *McKinnon, J.*, in Superior Court, WAKE County, on 17 November 1988. Heard in the Supreme Court on 11 October 1989.

*Maupin, Taylor, Ellis & Adams, P.A., by W. W. Taylor, Jr., Charles B. Neely, Jr., Thomas A. Farr and John T. Matteson, for the plaintiff.*

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, and James Wallace, Jr., Assistant Attorney General, for the original defendants.*

*Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A., by James E. Ferguson, II, and Leslie J. Winner, for the intervening defendant.*

MITCHELL, Justice.

His Excellency The Governor of North Carolina, the Honorable James G. Martin, initiated this declaratory judgment action by the filing of a complaint on 23 December 1987 in his official capacity as Governor of the State of North Carolina and in his individual capacity as a citizen of the State. By his complaint, the plaintiff sought a construction of Chapter 509 of the 1987 North Carolina Session Laws (hereafter "Chapter 509").[1] The plaintiff also sought a declaration that certain provisions of Chapter 509 violate the Constitution of North Carolina and sought an injunction prohibiting the holding of primary or general elections for certain superior court judgeships pursuant to the requirements of Chapter 509.

The original defendants, the North Carolina State Board of Elections and certain regular superior court judges, filed an answer on 22 January 1988. On the same day, the trial court entered an order granting the motion of the North Carolina Association of Black Lawyers to intervene as a defendant.

On 17 November 1988, the trial court entered judgment granting in part and denying in part the plaintiff's and defendants' motions for summary judgment and granting in part injunctive relief sought by the plaintiff. Both the plaintiff and the defendants entered timely notices of appeal. The petition by all parties for discretionary

---

1. 1987 N.C. Sess. Laws ch. 509 added, repealed and modified various sections and subsections of N.C.G.S. chs. 7A and 163. The provisions directly challenged by the plaintiff primarily relate to the elections, districts and terms of office for various regular superior court judgeships.

STATE ex rel. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

review of the judgment of the trial court, prior to a determination by the Court of Appeals, was allowed by this Court on 6 March 1989.

This action was heard by the trial court upon stipulated facts. Therefore, the facts material to the issues presented before this Court are undisputed.

The State of North Carolina has had several Constitutions. The current judicial article, article IV, was entirely rewritten and ratified by the voters in 1962 and was not substantively changed when the Constitution of 1971 was ratified. *See* J. Sanders, *A Brief History of the Constitutions of North Carolina*, in *Constitution of North Carolina: Its History and Content* (1987). The following provisions of article IV are relevant to the issues raised in this litigation:

Sec. 9. Superior Courts.

(1) *Superior Court Districts*. The General Assembly shall, from time to time, divide the State into a convenient number of Superior Court judicial districts and shall provide for the election of one or more Superior Court Judges for each district. Each regular Superior Court Judge shall reside in the district for which he is elected. . . .

. . . .

Sec. 16. Terms of office and election of . . . Judges of the Superior Court.

. . . [R]egular Judges of the Superior Court shall be elected by the qualified voters and shall hold office for terms of eight years and until their successors are elected and qualified. . . . Regular Judges of the Superior Court may be elected by the qualified voters of the State or by the voters of their respective districts, as the General Assembly may prescribe.

. . . .

Sec. 19. Vacancies.

Unless otherwise provided in this Article, all vacancies occurring in the offices provided for by this Article shall be filled by appointment of the Governor, and the appointees shall hold their places until the next election for members

**STATE EX REL. MARTIN v. PRESTON**

[325 N.C. 438 (1989)]

of the General Assembly that is held more than 60 days after the vacancy occurs, when elections shall be held to fill the offices.

N.C. Const. art. IV.

Chapter 509 was ratified by the General Assembly of North Carolina on 29 June 1987 and became effective upon its ratification. It increased the number of superior court judicial districts in North Carolina from thirty-four to sixty. Eighteen of the former judicial districts were retained under Chapter 509. Twenty-four new judicial districts were created by dividing former districts—ignoring county boundaries and dividing counties—into separate judicial districts as follows:

1. Former District 7, comprised of Nash, Edgecombe, and Wilson Counties, was divided into District 7A, comprised of Nash County; District 7B, comprised of part of Edgecombe County and part of Wilson County; and District 7C, comprised of part of Edgecombe County and part of Wilson County;

2. Former District 10, comprised of Wake County, was divided into Districts 10A, 10B, 10C, and 10D, each of which is comprised of a part of Wake County;

3. Former District 12, comprised of Cumberland County and Hoke County, was divided into Districts 12A, 12B, and 12C, all comprised of parts of Cumberland County, with Hoke County being placed with Scotland County in District 16A;

4. Former District 14, comprised of Durham County, was divided into Districts 14A and 14B, each of which is comprised of a part of Durham County;

5. Former District 18, comprised of Guilford County, was divided into Districts 18A, 18B, 18C, 18D, and 18E, each of which is comprised of a part of Guilford County;

6. Former District 21, comprised of Forsyth County, was divided into Districts 21A, 21B, 21C, and 21D, each of which is comprised of a part of Forsyth County; and

7. Former District 26, comprised of Mecklenburg County, was divided into Districts 26A, 26B, and 26C, each of which is comprised of a part of Mecklenburg County. 1987 N.C. Sess. Laws ch. 509, tit. I, § 1(a), (b), and (c) (codified as N.C.G.S. § 7A-41(a), (b), and (c) ).

Chapter 509 also created eighteen new judicial districts comprised of one or more entire counties:

1. Former District 3, comprised of Pitt, Craven, Pamlico, and Carteret Counties, was divided into District 3A (Pitt) and District 3B (Craven, Pamlico, and Carteret);

2. Former District 4, comprised of Sampson, Duplin, Jones, and Onslow Counties, was divided into District 4A (Sampson, Duplin, and Jones) and District 4B (Onslow);

3. Former District 6, comprised of Halifax, Northampton, Hertford, and Bertie Counties, was divided into District 6A (Halifax) and District 6B (Northampton, Hertford, and Bertie);

4. Former District 8, comprised of Greene, Lenoir, and Wayne Counties, was divided into District 8A (Greene and Lenoir) and District 8B (Wayne);

5. Former District 16, comprised of Scotland and Robeson Counties, was divided into District 16A (Hoke County, taken from former District 12, and Scotland County) and District 16B (Robeson);

6. Former District 19A, comprised of Cabarrus and Rowan Counties, was divided into District 19A (Cabarrus) and District 19C (Rowan);

7. Former District 20, comprised of Anson, Richmond, Moore, Union, and Stanly Counties, was divided into District 20A (Anson, Richmond, and Moore) and District 20B (Union and Stanly);

8. Former District 25, comprised of Caldwell, Burke, and Catawba Counties, was divided into District 25A (Caldwell and Burke) and District 25B (Catawba); and

9. Former District 30, comprised of Cherokee, Graham, Clay, Swain, Macon, Haywood, and Jackson Counties, was divided into District 30A (Cherokee, Graham, Clay, Macon, and Swain) and District 30B (Haywood and Jackson). *Id.*

Under Chapter 509 a total of forty incumbent regular superior court judges were assigned to thirty-four of the new judicial districts. 1987 N.C. Sess. Laws ch. 509, tit. I, § 1(d) (codified as N.C.G.S. § 7A-41(d) ). Chapter 509 changed the election dates for, *inter alia*, eight superior court judgeships by two years and for a ninth judgeship by four years, thereby eliminating the system of staggered terms of office for regular superior court judgeships which

had previously existed in some multi-seat districts. *Id.*, § 1(d)(7), (17), (22), (25), (26), (47), (52), (54), and (55) (codified as N.C.G.S. § 7A-41(d)(7), (17), (22), (25), (26), (47), (52), (54), and (55) ). Chapter 509 also provided that no person may file as a candidate for a superior court judgeship or be nominated for the office of superior court judge under N.C.G.S. § 163-114 "unless that person is a resident of the judicial district as it will exist at the time the person would take office if elected." *Id.*, tit. IV, § 13 (codified as N.C.G.S. § 163-106(i) ).

Following the State's submission of Chapter 509 to the Attorney General of the United States for preclearance pursuant to the provisions of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, the Attorney General advised the State by letter of 25 September 1987 that he chose to interpose no objection under 42 U.S.C. 1973c to the submitted legislation.

The trial court conducted a hearing upon cross-motions by the plaintiff and the defendants for summary judgment as to the constitutionality of various provisions of Chapter 509. All pertinent facts having been stipulated by the parties, the trial court concluded that: "Because there is no dispute as to any issue of material fact bearing on State constitutional issues, entry of summary judgment is appropriate as to the State constitutional issues raised in this action." The trial court further concluded that, to the extent that Chapter 509 "extended" the terms of some regular superior court judgeships and, in each instance, designated the incumbent judge to hold the office during the extended period, Chapter 509 violated the provisions of article IV, section 16 of the Constitution of North Carolina. As a result, the trial court granted the plaintiff's motion for summary judgment declaring those subsections of N.C.G.S. § 7A-41(d) unconstitutional and enjoined their enforcement. The trial court denied the defendants' motion for summary judgment to the extent that it sought to have those subsections declared constitutionally valid. As to all other provisions contained in Chapter 509, the trial court allowed the defendants' motion for summary judgment declaring Chapter 509 constitutional and enforceable.

The issues raised by the plaintiff and the original defendants in the trial court and before this Court on appeal are limited exclusively to questions concerning the interpretation of North Carolina statutes and the constitutionality *vel non* of those statutes under the Constitution of North Carolina. As we conclude that the an-

swers to those questions — questions exclusively of state law — are dispositive of this case on appeal, a brief review of North Carolina's long history of state constitutional jurisprudence is appropriate.

[1] Prior to the creation of the United States of America by the ratification of the Constitution of the United States, North Carolina courts applied the doctrine of judicial review to strike down a legislative act as contrary to the Constitution of North Carolina. *Bayard v. Singleton*, 1 N.C. (Mart.) 5 (1787). Thus, approximately sixteen years before *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L. Ed. 135 (1803), North Carolina's courts were among the first to recognize the doctrine of judicial review. Further, applying judicial review under the "law of the land" clause of the Constitution of North Carolina, the Supreme Court of North Carolina, in *University v. Foy*, 5 N.C. (1 Mur.) 58 (1805), became one of the first courts to define the modern concept of due process of law. C. Haines, *The American Doctrine of Judicial Supremacy* 63-121 (1914) (discussing state precedents for judicial review prior to 1789).

Since our earliest cases applying the power of judicial review under the Constitution of North Carolina, however, we have indicated that great deference will be paid to acts of the legislature — the agent of the people for enacting laws. This Court has always indicated that it will not lightly assume that an act of the legislature violates the will of the people of North Carolina as expressed by them in their Constitution and that we will find acts of the legislature repugnant to the Constitution only "if the repugnance do really exist and is plain." *Hoke v. Henderson*, 15 N.C. (4 Dev.) 1, 9 (1833) (Ruffin, C.J.), *overruled on other grounds by Mial v. Ellington*, 134 N.C. 131, 46 S.E. 961 (1903).

Our acceptance of our duty to exercise the power of judicial review under the Constitution of North Carolina, tempered by our recognition of every reasonable presumption that the legislature as the lawmaking agent of the people has not violated the people's Constitution, has led this Court in more recent generations to accept certain principles of state constitutional construction which are now well established. For example, it is firmly established that our State Constitution is not a grant of power. *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961). All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited

STATE EX REL. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

by that Constitution. *Id. See Lassiter v. Board of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958); *Airport Authority v. Johnson*, 226 N.C. 1, 8, 36 S.E.2d 803, 809 (1946).

It is well settled in this State that the courts have the power, and it is their duty in proper cases, to declare an act of the General Assembly unconstitutional—but it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of their powers by the representatives of the people.

*Glenn v. Board of Education*, 210 N.C. 525, 529-30, 187 S.E. 781, 784 (1936).

[2] Issues concerning the proper construction of the Constitution of North Carolina "are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments." *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953).

The will of the people as expressed in the Constitution is the supreme law of the land. In searching for this will or intent all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.

*State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944) (citations omitted). In interpreting our Constitution—as in interpreting a statute—where the meaning is clear from the words used, we will not search for a meaning elsewhere. *Elliott v. Board of Equalization*, 203 N.C. 749, 753, 166 S.E. 918, 920-21 (1932).

[3] It is also appropriate to note here that issues concerning the proper construction and application of North Carolina laws and the Constitution of North Carolina can only be answered with finality by this Court. *State v. Arrington*, 311 N.C. 633, 643, 319 S.E.2d 254, 260 (1984). *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 81, 64 L. Ed. 2d 741, 752 (1980) (affirming California's "sovereign right" to interpret its State Constitution); *Murdock v. City of Memphis*, 87 U.S. (20 Wall) 590, 22 L. Ed. 429 (1875). Further, it must be remembered that in construing and applying our laws and the Constitution of North Carolina, this Court is not bound

by the decisions of federal courts, including the Supreme Court of the United States, although in our discretion we may conclude that the reasoning of such decisions is persuasive. *See White v. Pate*, 308 N.C. 759, 766, 304 S.E.2d 199, 203 (1983); *Watch Co. v. Brand Distributors and Watch Co. v. Motor Market*, 285 N.C. 467, 474, 206 S.E.2d 141, 146 (1974).

Bearing the foregoing principles in mind, we turn to an examination of certain questions — purely of state constitutional and statutory construction and application — which have been raised by the parties before us and which we find dispositive of this case on appeal.

## DEFENDANTS' ASSIGNMENT OF ERROR

The sole assignment of error of either the original or intervening defendants which we need address concerns the effect of Chapter 509 on the election dates for certain superior court judgeships. Chapter 509, title I, § 1(d), amending N.C.G.S. § 7A-41(d), postponed the election dates for eight superior court judgeships by two years, and for a ninth judgeship by four years. Chapter 509 deviated to this extent from the otherwise statutorily established practice of holding elections for regular superior court judges at the general election immediately preceding the expiration of the incumbents' terms of office. The trial court held that these provisions of Chapter 509 violated our Constitution. The defendants assign error to this holding, and the parties advance several arguments supporting and refuting this part of the trial court's judgment. We conclude that the trial court's holding in this regard was error and reverse this part of its judgment.

[4] We note at the outset that the expressly stated purposes of the General Assembly in enacting Chapter 509 were "to provide for continued compliance with the Voting Rights Act and to improve the administration of justice by providing for the elimination of staggered terms for superior court judges, creating more superior court judicial districts, eliminating the office of special superior court judge, and making conforming changes." 1987 N.C. Sess. Laws ch. 509 (title). We conclude that the stated purposes of the General Assembly are beneficial public purposes and that Chapter 509 as enacted serves those purposes.[2]

---

2. There is considerable authority for the view that securing uniformity in the beginning of terms of office for public officials is, standing alone, a public

STATE EX REL. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

**[5]** Our Constitution provides that superior court judges "shall hold office for terms of eight years and until their successors are elected and qualified." N.C. Const. art. IV, § 16. The plaintiff argues, and the trial court concluded, that the provisions of Chapter 509 delaying certain elections unconstitutionally "extended" certain incumbent judges' terms of office. The defendants argue that the terms of office were not extended; the legislature merely created a one-time interim, for the briefest period possible, between terms of office to serve a legitimate public purpose. The defendants contend that the incumbents simply are holding over until their successors are elected and qualified.

We conclude that the effect of the provisions of Chapter 509 postponing certain elections was to cause each superior court judgeship within a multi-seat district to be placed on the same election schedule as the other judgeships in that district. Superior court terms of office, under our Constitution, must be eight years in length, so staggered terms could not be eliminated by shortening some existing terms of office. *Rhyne v. Lipscombe,* 122 N.C. 650, 29 S.E. 57 (1898). Instead, the legislature eliminated staggered terms within multi-seat judicial districts by creating a one-time interim or hiatus between certain terms of office. The current terms were not extended; they expire at the end of their eight-year duration. The next eight-year terms do not commence immediately upon the expiration of the old terms, however, but are instead made to commence two years, or in one case four years, later. Since no successors will be elected and qualified at the expiration of

purpose. *E.g., Wilson v. Clark,* 63 Kan. 505, 65 P. 705 (1901). We conclude that this independent purpose is an adequate public purpose to sustain Chapter 509 under our State Constitution. Further, questions concerning whether Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, applies to judicial elections and whether the existence of numbered seats or staggered terms of office for judges in multi-seat judicial districts violates that section are problematic. Although the Supreme Court of the United States has not spoken, a majority of the lower federal courts which have considered these questions appear to have held that Section 2 applies to judicial elections and that numbered seats and staggered elections in multi-seat judicial districts have the impermissible effect of diluting the votes of racial minorities. *See* Note, *State Judicial Elections and the Voting Rights Act: Will Section 2 Protect Minority Voters?,* 23 Ga. L. Rev. 787 (1989) (a compilation and analysis of federal cases to date on these questions). Although we need not and do not address the substance of such questions, we can and do conclude that our General Assembly could reasonably decide that, since neither numbered seats nor staggered terms exist in multi-seat judicial districts in North Carolina after the passage of Chapter 509, Chapter 509 was an act providing for "continued compliance with the Voting Rights Act" and that this too was a public purpose.

the old terms, the incumbent judges will continue to serve. Our Constitution anticipates such "hold over" situations by providing that elected judges remain in office "until their successors are elected and qualified." N.C. Const. art. IV, § 16.

The distinction between extended terms and an interim or hiatus separating terms may appear artificial at first, but is substantively sound upon analysis. While we have not directly addressed this issue previously, we agree with and see no need to improve upon the statements of the Supreme Court of Kansas in *Wilson v. Clark*, 63 Kan. 505, 65 P. 705 (1901), and *Murray v. Payne*, 137 Kan. 685, 21 P.2d 333 (1933), when it addressed the constitutionality of legislative acts which delayed elections for offices with mandated term lengths.

> [W]hen the constitution fixes the duration of a term it is not in the power of the legislature either to extend or abridge it. An examination of the act challenged, however, shows that no attempt has been made either to lengthen or shorten official terms, or to alter or affect the tenure of the incumbents of any of the offices named in the act. The policy of the statute, as we have seen, is to secure uniformity in the beginning of official terms . . . . The postponement of elections for one year is a reasonable and, in fact, the only practicable method of accomplishing the beneficial purpose of the legislature. If the legislature had postponed elections an unreasonable length of time, longer than was necessary to effect the avowed purpose, and so long as to betray an intention to make the offices appointive by preventing the people from choosing their officers at stated intervals and for regular terms, or, if it appeared that it was done merely to extend official terms and as a favor to incumbents of offices, there might be occasion for judicial interference and condemnation.

*Wilson v. Clark*, 63 Kan. at 510, 65 P. at 707.

> What happened was that by canceling the election in 1933, there is to be an interval, not a part of any term, between April, 1933, and April, 1935. Such an interval is given various names — interim, interregnum, exceptional term, etc. "Exceptional term" is a misnomer here, because no term of any length is involved.
>
> A term of office is one thing. An office holder is something else. The incumbent may go out, nobody come in, and the

term goes on. If a successor is appointed or elected, he fills the unexpired portion of the term. A term may come to an end, but the incumbent may rightfully carry on. . . .

When there is an interval between the end of a term and the beginning of another, the public business must go on without interruption. Some one must do the business in the capacity of a public officer. . . . The prevailing rule in the United States is that in the absence of constitutional or statutory provision to the contrary, express or implied, an officer is entitled to hold until his successor is chosen and has qualified.

*Murray v. Payne*, 137 Kan. at 689-90, 21 P.2d at 335. Other states have long held in accord with the Kansas Court's view which we find persuasive and adopt. *See McCoy v. Story*, 243 Ark. 1, 417 S.W.2d 954 (1967); *Scott v. State ex rel. Gibbs*, 151 Ind. 556, 52 N.E. 163 (1898); *Jordan v. Bailey*, 37 Minn. 174, 33 N.W. 778 (1887); *State ex rel. Attorney General v. McGovney*, 92 Mo. 428, 3 S.W. 867 (1887); *Best v. Moorhead*, 96 Neb. 602, 148 N.W. 551 (1914); *State ex rel. Barton v. McCracken*, 51 Ohio St. 123, 36 N.E. 941 (1894); *State ex rel. Wagner v. Compson*, 34 Ore. 25, 54 P. 349 (1898); *State Board of Education v. Commission of Finance*, 122 Utah 164, 247 P.2d 435 (1952).

The plaintiff's reliance on *Gemmer v. State ex rel. Stephens*, 163 Ind. 150, 71 N.E. 478 (1904), is misplaced, as that case is distinguishable from the instant controversy. *Gemmer* involved a legislative postponement of a county treasurer's election, but the constitutional provisions addressed in *Gemmer* were different from our constitutional provisions now at issue. Unlike the provisions of our Constitution under consideration here, the Indiana Constitution *specified* that the county treasurer was to be elected at the same time as legislators, set the date for such elections, required elections every two years, and prohibited a person from serving as treasurer for more than four out of six years. *Gemmer v. State ex rel. Stephens*, 163 Ind. at 160, 71 N.E. at 482. Therefore, the legislature's attempt by statute to modify the election schedule was contrary to very specific mandates of the Constitution of Indiana. Additional cases cited by the plaintiff are equally distinguishable.

We note that both the plaintiff's and the original defendants' discussions of *Opinion of the Judges*, 114 N.C. 925, 21 S.E. 963

(1894) are of no assistance. Not only is that opinion factually distinguishable, but advisory opinions formerly issued on occasion by this Court merely expressed the individual opinions of the subscribing justices and have no precedential authority. *In re Advisory Opinion,* 314 N.C. 679, 680, 335 S.E.2d 890, 891 (1985).

As noted earlier, one of Chapter 509's purposes was to eliminate staggered terms of office in multi-seat superior court districts. *See* 1987 N.C. Sess. Laws ch. 509 (title); *id.,* tit. I, § 1(d). Significantly, our Constitution does not specify when judicial elections are to be held, other than that they "shall be often held." N.C. Const. art. I, § 7. In contrast, our Constitution does specify an election schedule for the Governor, Lieutenant Governor, and Council of State members (every four years, *id.,* art. III §§ 2, 7), as well as General Assembly members (every two years, *id.,* art. II, § 6). The distinction between those provisions of our Constitution and the provisions before us in this case concerning judges must have been intentional and further evidences a constitutional intent for flexibility in setting the times for holding judicial elections.

[6]   The plaintiff also argues that by postponing elections Chapter 509 denies certain citizens their "fundamental right" under article IV, section 16 of the Constitution of North Carolina to vote for judges at the expiration of their eight-year terms of office. The right to vote *per se* is not a fundamental right under our Constitution; instead, once the right to vote is conferred, the *equal* right to vote is a fundamental right. *White v. Pate,* 308 N.C. 759, 768, 304 S.E.2d 199, 205 (1983).

As discussed previously, our Constitution does not specify when judicial elections must be held. "[T]he public has no vested right in the election of any officer except as that mode of selection may be guaranteed by the Constitution, under provisions which are unalterable by legislative action." *Penny v. Board of Elections,* 217 N.C. 276, 279, 7 S.E.2d 559, 561 (1940). Our Constitution sets no specific interval between judicial elections — as it does for certain executive and legislative elections — but only requires that superior court judgeships have eight-year terms of office and that elections be "often" and "free." *See* N.C. Const. art. I, §§ 7, 8. Therefore, the one-time delay in certain judicial elections created by Chapter 509 did not violate a right of citizens to vote guaranteed by our Constitution.

STATE ex rel. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

[7] The plaintiff also contends that, by delaying elections in certain districts, Chapter 509 denies qualified candidates their right to seek office. However, the right to seek office "is a political privilege and not inalienable, and certainly when a different method of selection has been provided, consistent with the Constitution, the fact that [a candidate's] aspiration has been thwarted by a nondiscriminatory change of the law gives him no cause of action." *Penny v. Board of Elections*, 217 N.C. at 279, 7 S.E.2d at 561.

[8] The plaintiff further contends that, by allowing nine judges to hold over in office beyond their terms' expirations, the legislature has unconstitutionally usurped his authority to make judicial appointments. Article IV, section 19 of the Constitution of North Carolina provides that vacancies in judicial offices are to be filled by gubernatorial appointment unless otherwise provided in article IV. In light of our foregoing analysis, the plaintiff's contention is incorrect. Once the incumbent judges' terms of office expire, their service ends when their successors are elected and qualified. N.C. Const. art. IV, § 16. Where, as here, the incumbents' terms end without successors having been elected and qualified, and new terms of office have not begun, the Constitution's "hold over" provision operates and allows the incumbents to continue serving in the interim. *See id.* The constitutional provision, not the legislative act, allows the judges to remain in office. No vacancies arise and no legislative appointments have been made.

[9] The plaintiff argues that the eight-year term limitation is meaningless if the legislature has the power to postpone the election of a superior court judge's successor beyond the general election immediately preceding the current term of office's expiration. We do not agree. Chapter 509 only creates a one-time election delay in certain districts for the reasonable public purpose of eliminating staggered elections in multi-seat districts. We do not mean to imply, however, that the legislature may delay such elections for purposes other than public purposes or for periods of time longer than necessary to achieve such public purposes.

[10] The plaintiff finally argues that delaying elections in certain judicial districts confers a separate emolument upon the incumbents, violating article I, section 32 of our Constitution. We disagree.

Article I, section 32 of our Constitution provides that "[n]o person or set of persons is entitled to exclusive or separate emoluments or privileges from the community but in consideration

of public services." This Court has previously said that "not every classification which favors a particular group of persons is an 'exclusive or separate emolument or privilege' within the meaning of the constitutional prohibition." *Lowe v. Tarble*, 312 N.C. 467, 470, 323 S.E.2d 19, 21 (1984), *aff'd on rehearing*, 313 N.C. 460, 329 S.E.2d 648 (1985).

> In sum, a statute which confers an exemption that benefits a particular group of persons is not an exclusive emolument or privilege within the meaning of Article I, section 32, if: (1) the exemption is intended to promote the general welfare rather than the benefit of the individual, and (2) there is a reasonable basis for the legislature to conclude the granting of the exemption serves the public interest.

*Town of Emerald Isle v. State of N.C.*, 320 N.C. 640, 654, 360 S.E.2d 756, 764 (1987).

The incumbent·judges do receive a benefit here from holding over in office. However, public and private interests often coincide, and "[t]he initial responsibility for determining what is and what is not a public purpose rests with the legislature, and its findings with reference thereto are entitled to great weight." *Mitchell v. Financing Authority*, 273 N.C. 137, 144, 159 S.E.2d 745, 750 (1968). In light of our prior discussion and the presumption of constitutionality given to legislative acts, we find any benefit to the incumbent judges to be incidental and subordinate to the legitimate public benefits obtained by delaying elections for certain superior court judges under Chapter 509.

In summary, our Constitution does not specify when judicial elections must be held, and it does have a "hold over" provision. Our legislature was thus free under our Constitution to delay elections one time in certain districts for a public purpose, which resulted in the incumbents holding over. We conclude that the provisions of Chapter 509 creating a one-time delay of elections and a one-time interim or hiatus between terms of office for certain superior court judgeships — causing the incumbents to hold over until the next elections are held and the succeeding terms of office begin — serve a public purpose and do not violate the Constitution of North Carolina. To the extent that the judgment of the trial court held to the contrary, it is reversed.

STATE EX REL. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

## PLAINTIFF'S ASSIGNMENTS OF ERROR

[11]  The plaintiff first assigns as error the trial court's conclusion that no vacancy arose on 1 January 1989 in Superior Court District 27A by reason of the expiration of the term of office for the judgeship held then and currently by Judge Robert E. Gaines. For reasons which differ from those of the trial court, we agree with its conclusion in that regard.

Although the trial court declared the provisions of Chapter 509 delaying certain elections in certain superior court districts unconstitutional — which part of the judgment we reverse — the trial court did not conclude that a vacancy existed in the judgeship currently held by Judge Gaines. Of the nine judgeships for which elections were delayed by Chapter 509, only the one held by Judge Gaines involved a term of office expiring in 1988; the other eight involved terms of office expiring in 1990 or later.

The plaintiff argues that the only reason an elected and qualified successor for Judge Gaines did not exist at his term of office's expiration on 31 December 1988 was that the legislature had unconstitutionally canceled the "regularly scheduled election" for that office. For reasons extensively discussed in addressing the defendants' assignment of error above, we conclude that the legislature acted within its constitutional authority when it delayed from 1988 to 1990 the election for the office occupied by Judge Gaines and when it caused the next eight-year term for that office to begin on 1 January 1991. Judge Gaines may hold over in office until his successor is elected and qualified, as no vacancy in the office he holds was created by such provisions of Chapter 509. This assignment of error by the plaintiff is overruled.

[12]  The plaintiff next assigns as error the refusal of the trial court to declare unconstitutional those provisions of Chapter 509 which purport to assign forty incumbent superior court judges to the new districts in which they reside. We do not agree. Having divided certain existing judicial districts into two or more new judicial districts, the legislature assigned certain regular superior court judges, who had been elected from the old districts, to serve new districts in which they reside. Their new districts, in all instances, are comprised of portions of their old districts. The trial court concluded that Chapter 509 did not violate the Constitution of North Carolina in this regard. We affirm this portion of the trial court's judgment.

STATE EX REL. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

The plaintiff has brought forward several arguments in support of this assignment of error which we address *seriatim*.

The plaintiff first argues that the legislative assignments of forty superior court judges made it "impossible" for those judges to reside in the districts for which they were elected, because the districts for which they were elected no longer exist. We do not agree.

Historically, necessity has prompted the subdivision of political authority. Progress demands that government should be further refined in order to best respond to changing conditions. Several provisions of our Constitution provide the elasticity which ensures the responsive operation of government. Specifically, the Constitution of North Carolina allows the General Assembly *"from time to time*, [to] divide the State into a *convenient number* of Superior Court Judicial Districts." N.C. Const. art IV, § 9(1) (emphasis added). Indeed, the General Assembly is free to divide the judicial districts whenever the need exists. *Rhyne v. Lipscombe*, 122 N.C. 650, 655, 29 S.E. 57, 58 (1898).

Chapter 509 subdivided, *inter alia*, sixteen existing superior court districts to conveniently apportion judicial resources evenly throughout the state. At the time of enactment of Chapter 509, thirty-seven regular superior court judges had been elected from those sixteen districts. Those judges were in various stages of their eight-year terms. As we have previously noted, the legislature could neither shorten nor eliminate the terms of those incumbent superior court judges. *Id.* Therefore, the General Assembly was forced to make a practical decision concerning the proper judicial district to which the judgeships held by those judges should be assigned.

In light of the requirement in our Constitution that "[e]ach regular Superior Court Judge shall reside in the district for which he is elected," the General Assembly assigned all of the incumbent superior court judges involved to the districts of their residence. N.C. Const. art. IV, § 9(1). The districts to which the incumbent judges were assigned represent, in all instances, subdivisions of the former districts for and from which they were elected. While Chapter 509 reduced the geographic area of the district for which each of those incumbent judges was elected, the new smaller district is, in each instance, comprised of a part of the area of the former district and a subset of the same voters who nominated or elected

STATE EX REL. MARTIN v. PRESTON

[325 N.C. 438 (1989)]

the incumbent judge assigned. Therefore, we conclude that under Chapter 509 those resident superior court judges continue to serve and reside in districts for which they were elected, to the extent required by our Constitution.

The plaintiff next argues that Chapter 509 unconstitutionally deprived the voters of the new smaller districts of their right to elect superior court judges. The plaintiff argues that Chapter 509 creates new judicial districts in which no incumbents survive. He asserts that all judges for the new districts must now be chosen by districtwide nomination and statewide election. This argument implies that Chapter 509 abolished the terms of incumbent judges. We do not agree. The General Assembly cannot shorten or eliminate the term of a resident superior court judge. *Rhyne v. Lipscombe*, 122 N.C. at 655, 29 S.E. at 58.

We conclude that the incumbent judges assigned to new smaller districts carved out of their former larger districts by Chapter 509 were properly elected to serve the new districts within the meaning of our Constitution. Although the new districts were smaller in size, the voters residing in the new districts fully participated, in all instances, in the districtwide primary elections and statewide general elections by which the incumbent judges assigned to them were chosen. Under Chapter 509, the incumbents assigned to those new districts continue to serve the terms for which they were elected.

[13] By his next argument, the plaintiff contends that the legislative assignments of judges to the new smaller districts amounted to appointments of individuals to vacant superior court judgeships in violation of the doctrine of separation of powers. N.C. Const. art. I, § 6. The defendants counter that the legislature only placed duly elected and qualified incumbents in districts for which they were elected. For reasons previously discussed, no vacancies in the offices held by the incumbent judges arose by virtue of the enactment of Chapter 509. Therefore, no appointments have been made. Indeed, where former districts have been divided and no resident incumbent has been assigned to certain of the new smaller districts, Chapter 509 provides that the regular superior court judgeships for those new districts be filled by election. Therefore, this argument by the plaintiff is without merit.

[14] The plaintiff next argues that the assignment of the incumbent superior court judges in question disenfranchised those Democratic voters who reside in the new smaller districts by deny-

ing them the right to vote in a districtwide party primary for the offices held by the incumbents. As we have already fully discussed, Chapter 509 has not excluded any qualified voter residing in the new districts from the primary and general election process. For the reasons we have discussed, no Democratic voters residing in the new districts have been denied participation in that party's districtwide nomination process.

[15] By his next argument, the plaintiff contends that the legislative assignment of incumbent judges to the smaller new districts deprived potential candidates of their right to run for superior court judgeships and constitutes a separate emolument. Again, the plaintiff assumes that vacancies were created in the offices held by the incumbent judges assigned to the new districts and that the legislative assignments amounted to appointments to those offices. We disagree for reasons already fully discussed.

For the reasons we have discussed, we conclude that the trial court did not err in that part of its judgment refusing to declare unconstitutional the provisions of Chapter 509 assigning certain incumbent resident superior court judges to new smaller districts in which they reside and which were carved from the former larger districts for which they were elected. Therefore, this assignment of error by the plaintiff is without merit and is overruled.

[16] By his next assignment of error the plaintiff contends that the trial court erred by upholding those provisions of Chapter 509 creating new superior court districts consisting of less than a whole county and two new superior court districts which consist, in both instances, of parts of two different counties. We do not agree.

Chapter 509, *inter alia*, created certain new superior court districts which do not follow county boundaries. The plaintiff argues that superior court districts must be comprised of whole counties and that the legislature's creation of new judicial districts which are not so comprised violated our constitution. The trial court held that Chapter 509 was constitutional in this regard. We affirm this portion of the trial court's judgment.

Our Constitution anticipates that the needs of the state will change over time. It specifically provides that "[t]he General Assembly shall, *from time to time*, divide the State into a *convenient* number of Superior Court judicial districts . . . ." N.C. Const. art. IV, § 9(1) (emphasis added). Contrary to the plaintiff's argu-

ment, there is no prohibition in our Constitution against the splitting of counties when creating superior court districts. Instead, our Constitution only requires that any division of the state into judicial districts be "convenient."

The plaintiff argues that our Constitution implicitly requires that each superior court district must consist of a whole county or whole counties. The plaintiff employs article IV, section 9(3) to support his contention. Since our Constitution requires one clerk of superior court per county, the plaintiff asserts that the framers of our Constitution assumed that each county would have one superior court. We are not persuaded.

The clerk of superior court is a county officer. *Id.* art. IV, § 9(3). On the other hand, a superior court judge is a state officer; each judge is elected in a statewide general election and may hold court in any county of the state. *Id.* art. IV, § 9(1). Therefore, comparing superior court judges to clerks of court is not persuasive.

The plaintiff also points out that our Constitution provides that, "[f]or each county, the senior resident Judge of the Superior Court serving the county shall appoint . . . Magistrates who shall be officers of the district court." *Id.* art. IV, § 10. The plaintiff argues that such language assumes that only one superior court shall exist in each county and that the magistrates serving the county shall be appointed by a judicial officer whose constituency includes all of the voters in the county. We do not agree.

Our Constitution *specifically requires* that county boundaries be followed in creating legislative districts. *Id.* art. II, §§ 3, 5. Our Constitution *does not require*, however, that county boundaries be followed in creating judicial districts. *See id.* art. IV. We conclude that this distinction between legislative and judicial districts in our Constitution was intentional and that the legislature is not required to follow county boundaries when dividing the state "from time to time" into a "convenient number of Superior Court judicial districts." *Id.* art. IV, § 9(1). Therefore, we conclude that this assignment of error by the plaintiff is without merit, and it is overruled.

[17] The plaintiff also assigns as error that part of the judgment of the trial court declaring constitutional the provisions of Chapter 509, amending N.C.G.S. § 163-106, which provide that

[n]o person may file a notice of candidacy for superior court judge unless that person is at the time of filing the notice

of candidacy a resident of the judicial district as it will exist
at the time the person would take office if elected. . . . This
subsection implements Article IV Section 9 (1) of the North
Carolina Constitution which requires regular Superior Court
Judges to reside in the district for which elected.

1987 N.C. Sess. Laws ch. 509, tit. IV, § 13. We conclude that the
trial court did not err in declaring that these provisions are con-
stitutionally valid. Accordingly, we affirm that portion of the trial
court's judgment.

The Constitution of North Carolina requires that "[e]ach regular
Superior Court Judge shall reside in the district for which he
is elected." N.C. Const. art. IV, § 9. The plaintiff argues that our
Constitution imposes only a *post-election* residency requirement,
and Chapter 509's pre-candidacy residency requirement unconstitu-
tionally denies otherwise qualified candidates the right to seek
office. We do not agree.

Our Constitution sets very specific residency requirements for
certain elective offices. Candidates for Governor and Lieutenant
Governor must reside in North Carolina "for two years immediately
preceding [their] election." *Id.* art. III, § 2. Candidates for the General
Assembly must reside in their districts "for one year immediately
preceding [their] election." *Id.* art. II, §§ 6, 7. Comparing those
very specific residency requirements for candidates for executive
and legislative offices with our Constitution's more general language
addressing residency requirements for candidates for the superior
court, we perceive a constitutional intent to provide the legislature
some limited flexibility in setting residency requirements for can-
didates for superior court judgeships. Given the well-established
presumption in favor of the constitutionality of legislative acts,
we will not upset the reasonable interpretation of our Constitution
reflected in the language the legislature used in adopting these
provisions of Chapter 509. The plaintiff's assignment of error is
overruled.

For the foregoing reasons, we conclude that Chapter 509 as
enacted by the General Assembly does not violate our State Con-
stitution and is fully effective. Therefore, we hold that the trial
court erred in those parts of its judgment declaring that certain
provisions of Chapter 509 violate the Constitution of North Carolina.
Accordingly, we reverse those parts of the trial court's judgment
and dissolve the injunctive relief granted by the trial court. We

affirm the remaining parts of the trial court's judgment which declared that the other provisions of Chapter 509 at issue do not violate the Constitution of North Carolina.

Our conclusions and holdings with regard to this case on appeal are based exclusively upon our resolution of independent questions of state law wholly adequate to support our disposition of the issues presented. Therefore, we do not reach, consider or decide any federal question whatsoever.

Affirmed in part and reversed in part.