IN THE SUPREME COURT OF NORTH CAROLINA

No. 315PA18-2

Filed 18 December 2020

ROY A. COOPER, III, individually and in his official capacity as GOVERNOR OF THE STATE OF NORTH CAROLINA

v.

PHILIP E. BERGER, in his official capacity as PRESIDENT PRO TEMPORE OF THE NORTH CAROLINA SENATE; TIMOTHY K. MOORE, in his official capacity as SPEAKER OF THE NORTH CAROLINA HOUSE OF REPRESENTATIVES; CHARLTON L. ALLEN, in his official capacity as CHAIR OF THE NORTH CAROLINA INDUSTRIAL COMMISSION; and YOLANDA K. STITH, in her official capacity as VICE-CHAIR OF THE NORTH CAROLINA INDUSTRIAL COMMISSION

On discretionary review pursuant to N.C.G.S. § 7A-30 and § 7A-31 of a unanimous, published decision of the Court of Appeals, 837 S.E.2d 7 (N.C. Ct. App. 2019), affirming a final judgment entered on 9 April 2018 by Judge Henry W. Hight, Jr., in Superior Court, Wake County. Heard in the Supreme Court on 31 August 2020.

*Daniel F. E. Smith, Jim W. Phillips, Jr., and Eric M. David, for plaintiff-appellant Roy Cooper, Governor of the State of North Carolina.*

*Nelson Mullins Riley & Scarborough LLP, by D. Martin Warf and Noah H. Huffstetler, III, for defendants-appellee Philip E. Berger and Timothy K. Moore.*

*K&L Gates LLP, by Matthew T. Houston and Zachary S. Buckheit, for amicus curiae North Carolina Chamber Legal Institute.*

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General; James W. Doggett, Deputy Solicitor General; and Daniel P. Mosteller, Special Deputy Attorney General, for amicus curiae State of North Carolina.*

ERVIN, Justice.

The issue before us in this case is the extent to which the Governor of the State of North Carolina, as compared to the North Carolina General Assembly, has the authority to determine the manner in which monies derived from three specific federal block grant programs should be distributed to specific programs. After careful consideration of the record in light of the applicable law, we hold that the General Assembly did not overstep its constitutional authority by appropriating the relevant federal block grant money in a manner that differs from the Governor's preferred method for distributing the funds in question. As a result, the Court of Appeals' decision upholding the trial court's decision to grant judgment on the pleadings in favor of the legislative defendants and against the Governor in this case is affirmed.

I. Factual Background

A. Substantive Facts

In March of 2017, plaintiff-appellant Roy A. Cooper, III, acting in his capacity as the duly-elected Governor, submitted a recommended budget to the General Assembly in which he suggested that funds derived from three specific federal block grant programs be spent in a particular manner. More specifically, the Governor recommended (1) that monies received from the Community Development Block Grant (CDBG) program be spent in such a manner that $10,000,000 would be allocated to "Scattered Site Housing" projects, $13,737,500 would be allocated to "Economic Development" projects, and $18,725,000 would be allocated to "Infrastructure" projects; that monies received from the Substance Abuse Block

Grant (SABG) program be spent in such a manner that $29,322,717 would be allocated to projects related to "Substance Abuse Treatment for Children and Adults"; and that monies received from the Maternal and Child Health Block Grant (MCHBG) program be spent in such a manner that $14,070,680 would be allocated to projects related to "Women and Children's Health Services."

On 22 June 2017, the General Assembly adopted Senate Bill 257, which approved a state budget for the 2017–2019 biennium. Although the Governor vetoed Senate Bill 257, the General Assembly overrode the Governor's veto, so that the legislation in question became law as Session Law 2017-57. In its approved budget, the General Assembly redirected approximately $13,000,000 in funds derived from the CDBG program, $2,200,000 in funds derived from the SABG program, and $2,300,000 in funds derived from the MCHBG program to projects selected by the General Assembly. More specifically, Session Law 2017-57 redirected funds derived from the CDBG program to "Neighborhood Revitalization" projects and away from "Scattered Site Housing," "Economic Development," and "Infrastructure" projects; redirected funds derived from the SABG program to "Competitive Block Grant" projects and away from "Substance Abuse Treatment Services for Children and Adults" projects; and redirected funds derived from the MCHBG program to a "Perinatal Strategic Plan Support Position" project and the "Every Week Counts" project and away from "Women and Children's Health Services" projects. 2017 N.C. Sess. Laws 57 §§ 11A.14.(a), 11L.1.(a), 11L.1.(y)–(z), 11L.1.(aa)–(ee), 15.1.(a), 15.1.(d).

B. Procedural History

1. Trial Court Proceedings

On 26 May 2017 the Governor filed a complaint against defendants Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate; Timothy K. Moore, in his official capacity as the Speaker of the North Carolina House of Representatives; and two additional defendants, in their capacities as officials of the North Carolina Industrial Commission.[1] In his original complaint, the Governor challenged the constitutionality of two state session laws and six state statutes that had been enacted by the General Assembly in late 2016 and early 2017 immediately prior to and shortly after the Governor took office on the grounds that the challenged legislation unconstitutionally curtailed the Governor's authority as defined in the North Carolina State Constitution. On 8 August 2017, the Governor filed an amended complaint in which he added claims challenging the constitutionality of the 2017–19 state budget as enacted in Session Law 2017-57. On 14 September 2017, the legislative defendants filed a responsive pleading in which they moved for dismissal of the Governor's amended complaint, denied the material allegations set out in the amended complaint, and asserted various affirmative defenses.

---

[1] In view of the fact that the issues that led to the naming of these two Industrial Commission officials as defendants are not before the Court in this appeal, we will refrain from discussing the claims that the Governor asserted relating to those defendants any further in this opinion.

On 16 March 2018, the Governor filed a motion seeking the entry of summary judgment in his favor with respect to two of the claims asserted in his amended complaint, including his challenge to the constitutionality of the enacted state budget and the reallocation of the monies derived from the CDBG program, the SABG program, and the MCHBG program. On 19 March 2018, the legislative defendants filed a motion seeking the entry of judgment on the pleadings in their favor with respect to the same claims.

On 4 April 2018, the pending motions came on for hearing before the trial court. On 9 April 2018, the trial court entered an order granting the legislative defendants' motion for judgment on the pleadings and dismissing the relevant claims as set forth in the amended complaint on the grounds that the disputed block grant funds were "designated for the State of North Carolina [to] be paid into the State treasury" and that, in accordance with N.C. Const. art., V, § 7, "no money can be drawn from the State treasury without an appropriation" by the General Assembly. The Governor noted an appeal to the Court of Appeals from the trial court's order.

## 2. Appellate Proceedings

In seeking relief from the order before the Court of Appeals, the Governor argued that the General Assembly did not have the authority to appropriate the relevant block grant funds by passing Session law 2017-57 on the theory that the funds in question were not contained "within" the State treasury. After conceding that, in accordance with the North Carolina State Constitution, money entering the

State treasury can only be appropriated in accordance with legislation adopted by the General Assembly, such as the state budget, the Governor argued that the block grant funds at issue in this case never entered the State treasury. As support for this contention, the Governor relied upon this Court's decision in *Gardner v. Bd. of Trustees of N.C. Local Governmental Employees' Ret. Sys.*, 226 N.C. 465, 468, 38 S.E.2d 314, 316 (1946), which described the "State treasury" as "[m]onies paid into the hands of the state treasurer *by virtue of a state law*" (emphasis added). According to the Governor, the block grant funds at issue in this case were raised and appropriated by federal, rather than state, law and should, for that reason, be treated as "custodial funds" that are "beyond the legislative power of appropriation." Arguing in reliance upon the Colorado Supreme Court's decision in *Colo. Gen. Assembly v. Lamm*, 700 P.2d 508, 524–25 (Colo. 1985) (*Lamm I*), the Governor asserts that custodial funds are monies that are "not generated by tax revenues" and have been "given to the state for particular purposes," a set of circumstances that places them outside the reach of the General Assembly's appropriation power and makes them subject to executive branch, rather than legislative branch, control.

On the other hand, the legislative defendants argued that the named recipient of the relevant block grant funds was "the State of North Carolina" and that, "[a]s such, the funds come into the State treasury and are properly subject to legislative appropriation, pursuant to Article V, Section 7(1) of the North Carolina Constitution," which provides that "[n]o money shall be drawn from the State treasury but in

consequence of appropriations made by law." As a result, the legislative defendants urged the Court of Appeals to affirm the trial court's order.

In affirming the trial court's order, the Court of Appeals began by analyzing the history and purpose of federal block grant programs. According to the Court of Appeals, the federal government had expanded the number of block grants over time on the theory that they "provided state and local governments additional flexibility in project selection" as compared to other types of grants. *Cooper v. Berger*, 837 S.E.2d 7, 13 (N.C. Ct. App. 2019) (*Cooper II*) (quoting Robert Jay Dilger & Michael H. Cecire, Cong. Research Serv., R40638, *Federal Grants to State and Local Governments: A Historical Perspective on Contemporary Issues* 39 (2019)). In addition, the Court of Appeals noted that, in the statutory provisions governing the relevant block grant programs, Congress had elected to refrain from including statutory language "that would have required state legislative appropriation of the . . . block grants" and to remain "silent regarding the authority of state legislatures to appropriate federal block grant funds." *Id*. at 14. Although the relevant block grant statutes "impose certain restrictions and criteria" upon their recipients, the Court of Appeals acknowledged that they afford "significant discretion to the recipient states on how that money is ultimately spent." *Id*. at 15.

The Court of Appeals rejected the Governor's contention that the relevant block grant monies were not part of the State treasury on the theory that *Gardner* actually expanded the types of funds deemed to be held within the State treasury rather than

limiting the contents of the State treasury to monies stemming from "taxes, fines, or penalties" raised pursuant to state law. *See Gardner*, 226 N.C. at 467, 38 S.E.2d at 316. In addition, the Court of Appeals noted that the block grant funds at issue in this case did, as a technical matter, "enter into the hands of the State Treasurer by virtue of a State Law" given the statutory mandate that:

> [a]ll funds belonging to the State of North Carolina, in the hands of any head of any department of the State which collects revenue for the State in any form whatsoever, and every institution, agency, officer, employee, or representative of the State or any agency, department, division or commission thereof . . . collecting or receiving any funds or money belonging to the State of North Carolina, shall daily deposit the same in some bank, or trust company, selected or designated by the State Treasurer, in the name of the State Treasurer.

N.C.G.S. § 147-77 (2019). Similarly, the Court of Appeals rejected the Governor's argument that Congress had intended for the executive branch in each state government to control the manner in which the relevant block grant monies were spent on the grounds that *Lamm II* had not persuaded it of the merits of that contention. *See Colorado General Assembly v. Lamm*, 738 P.2d 1156, 1169 (Colo. 1987) (*Lamm II*) (reviewing a number of block grant statutes, including those at issue in this case, and finding that "Congress has left the issue of state legislative appropriation of federal block grants for each state to determine").

The Court of Appeals agreed with the legislative defendants that the named recipient for the block grants was "the State of North Carolina" rather than the Governor or any state executive agency and concluded that "[t]he fact that specific

State agencies are tasked with administering each Block Grant does not render those agencies the sole beneficiaries or allocators to the exclusion of the rest of the State." *Cooper II*, 837 S.E.2d at 20. Finally, the Court of Appeals declined to hold that the relevant block grant funds constituted "custodial funds" or "agency funds" for purposes of N.C.G.S. §§ 143C-1-1, noting that the "General Assembly has been appropriating block grants . . . without challenge through the budgetary appropriations process since 1981." *Id*. at 21 (citing 1981 N.C. Sess. Laws Ch. 1282 § 6). As a result, since the Court of Appeals could not identify any constitutional support for the Governor's argument that the relevant block grant funds were outside the scope of the General Assembly's appropriation authority, it affirmed the trial court's order.

On 7 January 2020, the Governor filed a notice of appeal from the Court of Appeals' decision pursuant to N.C.G.S. § 7A-30(1) on the grounds that this case involves a substantial question arising under the North Carolina State Constitution and, in the alternative, a petition seeking discretionary review of the Court of Appeals' decision pursuant to N.C.G.S. § 7A-31(c). On 26 February 2020, this Court retained jurisdiction over the Governor's appeal and allowed the Governor's discretionary review petition.

II. Substantive Legal Issues

A. Positions of the Parties

1. Governor's Arguments

In seeking to persuade us to reverse the Court of Appeals decision, the Governor begins by contending that the Court of Appeals erred by determining that the block grant funds at issue in this case were "within the State treasury" and rejecting his assertion that N.C. Const. art. V, § 7, does not authorize the General Assembly to appropriate these federal block grant funds. In support of this assertion, the Governor places substantial reliance upon *Gardner*'s description of the "State treasury" as money that is "paid into the hands of the state treasurer by virtue of a state law," arguing that, in order for money to be within the State treasury, it must be "[1] obtained under the power of the state to enforce collection" and "[2] placed in the hands of the state treasurer to be handled by him in accordance with the provisions of a state law." 226 N.C. at 467, 38 S.E.2d at 316. As a result, the Governor contends that only money that is raised as the result of state taxation or some other state revenue-generating activity should be deemed to be part of the State treasury. *Id.* at 467, 38 S.E.2d at 316; *see also Garner v. Worth*, 122 N.C. 250, 29 S.E. 364 (1898) (defining the State treasurer as "the officer in whose hands the legislative department has placed the *funds it has raised and appropriated*") (emphasis added).

As additional support for this argument, the Governor relies upon N.C. Const. art. IX, § 6, which defines the "State school fund" and provides that:

> The proceeds of all lands that have been or hereafter may be granted by the United States to this State, and not otherwise appropriated by this State or the United States; all moneys, stocks, bonds, and other property belonging to the State for purposes of public education; the net proceeds of all sales of the swamp lands belonging to the State; and *all other grants, gifts, and devises that have been or hereafter may be made to the State, and not otherwise appropriated by the State or by the terms of the grant, gift, or devise*, shall be paid into the State Treasury and, together with so much of the revenue of the State as may be set apart for that purpose, shall be faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools.

N.C. Const. art. IX, § 6 (emphasis added). In the Governor's view, monies derived from the relevant block grant programs constitute funds that are "otherwise appropriated . . . by the terms of the grant" and should not, for that reason, be deemed to have been paid into the State treasury.

The Governor further contends that the Court of Appeals erred by interpreting *Gardner* in such a manner as to find that funds enter the State treasury by virtue of N.C.G.S. § 147-77. In the Governor's view, the reasoning upon which the Court of Appeals relied impermissibly "allows a statutory enactment to determine a constitutional meaning." On the contrary, the Governor argues that, since the relevant federal block grant funds are not encompassed within the State treasury in light of the test articulated in *Gardner*, they constitute a separate category of "custodial funds" that are not subject to appropriation by the General Assembly. In support of this proposition, the Governor cites decisions from other jurisdictions, such as Colorado, Oklahoma, and Massachusetts, in which the highest court in the states

in question recognized the existence of a category of funds that was not subject to legislative appropriation. *See Lamm I*, 700 P.2d 508, 524–25 (Colo. 1985); *Opinion of the Justices to the Senate*, 378 N.E.2d 433, 436 (Mass. 1978); *In re Okla. ex rel. Dep't of Transp.*, 646 P.2d 605, 609–10 (Okla. 1982). According to the Governor, the concept of a "custodial fund" is explicitly recognized in N.C. Const. art. IX, § 6. In addition, the Governor claims that the relevant block grant funds constitute custodial funds given that they are "trust fund[s] or agency fund[s]" as described in N.C.G.S. § 143C-1-1 (defining state funds as "[a]ny moneys including federal funds deposited in the State treasury except moneys deposited in a trust fund or agency fund as described in G.S. 143C-1-3").

The Governor argues that the absence of any federal statutory language allowing state legislatures to appropriate the block grant funds indicates that Congress did not intend for state legislatures to exercise such authority. *See Alcoa S.S. Co. v. Fed. Mar. Comm'n*, 348 F.2d 756, 758 (D.C. Cir. 1965) (stating that, "[w]here Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power"). In addition, the Governor directs our attention to *In re Separation of Powers*, 305 N.C. 767, 772, 295 S.E.2d 589, 592 (1982), which he describes as recognizing that the 1982 General Assembly was uncertain as to whether it had the authority to enact legislation that would delegate decision-making authority relating to federal block grant monies to a twelve-member legislative committee. In an advisory opinion provided by this Court,

its members suggested that the enactment of such a statute would likely be unconstitutional before declining to decide whether the General Assembly was authorized "to determine how the [block grant] funds will be spent" given that the briefs and the other materials submitted for the Court's consideration "contain[ed] very little, if any, information about the grants, their purposes, for whom they are intended, and the conditions placed on them by Congress." 305 N.C. at 778, 295 S.E.2d at 595.

Secondly, the Governor argues that the General Assembly's appropriation of the relevant federal block grant funds violates the separation of powers provision of the State constitution, N.C. Const. art. I, § 6 (providing that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other"), and interferes with his constitutional duty to see that the laws are faithfully executed, N.C. Const. art. III, § 5(4) (providing that "[t]he Governor shall take care that the laws be faithfully executed."). In support of this assertion, the Governor directs our attention to this Court's decision in *State ex rel. McCrory v. Berger*, 368 N.C. 633, 645, 781 S.E.2d 248, 256 (2016), which holds that a separation of powers violation occurs "when one branch exercises power that the constitution vests exclusively in another branch" or when "the actions of one branch prevent another branch from performing its constitutional duties." According to the Governor, his duty to ensure that the laws are faithfully executed includes "the ability to affirmatively implement the policy decisions that executive branch agencies

subject to his or her control are allowed . . . to make," citing *Cooper v. Berger*, 370 N.C. 392, 414–15, 809 S.E.2d 98, 111–12 (2018) (*Cooper I*). In the Governor's view, his duty to ensure that the laws are faithfully executed encompasses the responsibility to determine the distribution and administration of the block grant funds that become available to the State of North Carolina. In essence, the Governor claims that, since the relevant block grant funds have already been appropriated "(by Congressional action), the only way for the General Assembly to coerce gubernatorial action is through (unconstitutional) interference with the Governor's spending of federal funds" by reappropriating those funds.

Thirdly, the Governor cites decisions from six other jurisdictions holding that the state executive branch exercises control of monies provided by the federal government to the exclusion of the state legislative branch and urges this Court to find that the relevant block grant funds are "custodial funds" not subject to state legislative appropriation. According to the Governor, "custodial funds" are those which have been appropriated by a federal statute specifying (1) "the purposes the state is directed to accomplish with the money," (2) "the manner in which the purposes are to be accomplished," and (3) "the restrictions placed on use of the funds by the federal government." *Lamm II*, 738 P.2d at 1173. Although the Governor acknowledges that decisions from the highest state courts in four other jurisdictions have held that monies derived from the federal government are subject to legislative appropriation, he argues that we should not find these decisions to be persuasive on

the grounds that "[a]pplication of the overly broad constitutional rules" applied in those cases "would distort North Carolina law."

## 2. Legislative Defendants' Arguments

In seeking to persuade us to affirm the Court of Appeals' decision, the legislative defendants begin by arguing that Congress, rather than making the relevant federal block grant monies subject to state executive branch control, "left the issue of state legislative appropriation of federal block grants for each state to determine," *citing Cooper II*, 837 S.E.2d 7, 19 (quoting *Lamm II*, 738 P.2d at 1169), and that the relevant federal statutes make the State, rather than any executive branch agency or official, the named recipient of the relevant grant funds, citing 42 U.S.C. §§ 5302, 5303 (defining a "State" as "any State of the United States, or any instrumentality thereof approved by the Governor" and authorizing the making of grants to "States, units of general local government, and Indian tribes"); 42 U.S.C. § 300x-64(b)(2) (defining "State" as "each of the several States, the District of Columbia, and each of the territories of the United States"); 42 U.S.C. §§ 701(c)(5)(b), 702(c) (defining "State" as "each of the 50 States and the District of Columbia" and providing that the federal government "shall allot to each State which has transmitted an application [for the funds] . . . an amount determined" by statute). As a result, the legislative defendants contend that the Court of Appeals correctly held that, as a constitutional matter, the relevant block grant funds "pass through the constitutional and codified budgetary process."

In addition, the legislative defendants contend that the Court of Appeals correctly interpreted *Gardner* as expanding, rather than limiting, the definition of the funds that are contained within the State treasury. According to the legislative defendants, this Court held in *Gardner* "that general funds derived from general taxation *and* funds coming into the hands of the State Treasurer by virtue of a State law . . . can be disbursed only in accordance with legislative authority," with *Gardner* providing no support for any contention that there is a category of state funds that is outside the General Assembly's appropriation authority. Similarly, the legislative defendants argue that N.C. Const. art. IX, § 6, does not create a category of funds that is outside legislative control given that the categories of funds to which it refers "*are* paid into the State Treasury and are then to be used exclusively for the public schools."

In the legislative defendants' view, the State constitution provides that the State Treasurer's duties "shall be prescribed by law," N.C. Const. art. III, § 7(2), with the General Assembly having directed the State Treasurer to "receive[ ] all moneys which shall from time to time be paid into the treasury of this state." *Gardner*, 226 N.C. at 468, 38 S.E.2d at 316 (citing N.C.G.S. § 147-68(a)). According to the legislative defendants, "it is not clear that the Governor (as opposed to the State) could even 'receive' the block grant funds at issue" given that N.C.G.S. § 143C-7-2(a) provides no support for such a proposition.

The legislative defendants also argue that the General Assembly is the policy-making branch of government, with the appropriation of funds ultimately being a policy decision, citing *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169–70, 594 S.E.2d 1, 8–9 (2004) (stating that "the General Assembly is the policy-making agency because it is a far more appropriate forum than the courts for implementing policy-based changes to our laws"). Although this Court did hold in *Cooper I* that the Governor should be free to "implement the policy decisions that executive branch agencies subject to his or her control are allowed, through delegation from the General Assembly, to make," this holding does not allow the Governor to make policy decisions that are outside of "the guardrails set by the General Assembly" in delegating its policy-making authority. *Cooper I*, 370 N.C. at 415 n.11, 809 S.E.2d at 112 n.11 (noting that the use of the phrase "the Governor's policy preferences" should "not be understood as suggesting that [a state executive agency] has the authority to make any policy decision that conflicts with or is not authorized by the General Assembly, subject to applicable constitutional limitations").

Finally, the defendants argue that the cases from other jurisdictions upon which the Governor relies that posit the existence of a category of "custodial" funds should not be deemed controlling in this case given that "each state constitution has its own unique history of development, both in terms of the constitutional text itself and of the judiciary's interpretation of that text." *Cooper v. Berger,* 371 N.C. 799, 813,

822 S.E.2d 286, 297 (2018). As a result, the legislative defendants urge us to affirm the Court of Appeals' decision.

### B. Analysis of the Parties' Positions

### 1. Standard of Review

According to well-established North Carolina law, this Court reviews constitutional questions using a de novo standard of review. *McCrory*, 368 N.C. at 639, 781 S.E.2d at 252 (citing *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001)). "In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." *Id.* (citing *Hart v. State*, 368 N.C. 122, 131, 774 S.E.2d 281, 287–88 (2015)). "All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *State ex rel. Martin v. Preston*, 325 N.C. 438, 448–49, 385 S.E.2d 473, 478 (1989). "The presumption of constitutionality is not, however, and should not be, conclusive," with an act of the General Assembly being subject to invalidation if it offends a specific constitutional provision beyond a reasonable doubt. *Moore v. Knightdale Bd. of Elections*, 331 N.C. 1, 4, 413 S.E.2d 541, 543 (1992). On the other hand, if a statute passed by the General Assembly complies with the requirements of the state and federal constitutions, it must be upheld. *See Town of Boone v. State*, 369 N.C. 126,

130, 794 S.E.2d 710, 714 (2016) (noting that the North Carolina constitution "is in no matter a grant of power" and that "all power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it") (quoting *Lassiter v. Northampton Cty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958)).

2. Federal Block Grant Programs

As an initial matter, we note that the federal block grant programs at issue in this case constitute "allocations of sums of money from the United States Government to the various states," the use of which "is largely left to the discretion of the recipient state" as long as that use falls within the broad statutory requirements of each grant.[2] *Legislative Research Comm'n By & Through Prather v. Brown*, 664 S.W.2d 907, 928 (Ky. 1984). The three block grants at issue in this case were created by means of the Omnibus Budget and Reconciliation Act of 1981 (OBRA), Pub.L. 97–35, in which Congress consolidated approximately seventy-five "categorical grants" into nine new block grant programs. *Lamm II*, 738 P.2d at 1160. At that time, block grants were viewed as a "midpoint in the continuum of recipient discretion" on the grounds that they afforded recipient states more control over the spending of federal funds than

---

[2] We are unable to discern anything in the relevant federal statutory provisions that prescribes the manner in which the funds derived from the federal block grants at issue in the case must be distributed to the actual payees. As the Governor conceded at oral argument, this case must be decided on the basis of state law rather than upon the basis of a determination that the relevant federal statutes require that the identification of the payees of the proceeds of the federal grant programs at issue in this case be made by either the executive or legislative branches of state government.

had been the case with monies derived from federal categorical grant programs, while giving the recipient states less control over the relevant grant funds than was afforded in connection with federal "revenue-sharing" funds.[3] *Cooper II*, 837 S.E.2d at 13 (quoting Robert Jay Dilger & Eugene Boyd, Cong. Research Serv., R40486, *Block Grants: Perspectives and Controversies* 3 (2014)); *see also Lamm II*, 738 P.2d at 1159. As a result, block grants were intended to give recipient states "substantial discretion in identifying problems and designing programs to meet those problems." *Lamm II*, 738 P.2d at 1159 (citing Advisory Commission on Intergovernmental Relations, *Safe Streets Reconsidered: The Block Grant Experience 1968–1975* 1 (1977)).

In advising Congress with respect to the enactment of OBRA, the United States Comptroller General opined that the categorical grant system inhibited the involvement of state legislatures in administering the monies in question and recommended that "these Federal constraints on state legislative involvement be removed." Report to the Congress by the Comptroller General of the United States, GGD–81–3 (Dec. 15, 1980), https://www.gao.gov/products/GGD-81-3. In addition, the Comptroller General found that "the absence of [state] legislative involvement adversely affect[ed] federal interests" by diminishing the recipient state's

---

[3] According to the Colorado Supreme Court, categorical grants "involve a high degree of federal regulation and often have gone to local governments or independent single-purpose agencies such as urban renewal authorities or housing authorities," while revenue sharing is a "general support payment program designed to provide financial resources to state and local governments to spend for local priorities." *Lamm II*, 738 P.2d at 1159.

accountability to the federal government given the absence of legislative oversight of state executive actions and recommended that OBRA "not be construed as limiting or negating the powers of the state legislatures under State law to appropriate federal funds." *Id.* at iii. However, Congress declined to "include in OBRA the comptroller general's recommendation that would have required state legislative appropriation of the OBRA block grants" and, instead, left "OBRA [ ] silent regarding the authority of state legislatures to appropriate federal block grant funds." *Lamm II*, 738 P.2d at 1160.

As the record reflects, North Carolina has been receiving funds pursuant to the three relevant federal block grants at issue in this case since those programs were created in 1981. Throughout that time, the General Assembly has appropriated the funds on an annual basis through the enactment of state budget legislation. *See, e.g.*, 1981 N.C. Sess. Laws Ch. 1282 § 6. In 2017, the proceeds made available by block grant programs and other federal grants made up 28.4% of North Carolina's total budget. Federal Aid to State and Local Governments, Center on Budget and Policy Priorities (Apr. 19, 2018), https://www.cbpp.org/research/state-budget-and-tax/federal-aid-to-state-and-local-governments.

The CDBG program is administered at the federal level by the United States Department of Housing and Urban Development (HUD), with its stated purpose being, among other things, "to eliminate blight, to conserve and renew older urban areas, to improve the living environment of low- and moderate-income families, . . .

to develop new centers of population growth and economic activity," and to provide "decent housing and a suitable living environment and expanding economic opportunities" for persons of low and moderate income. 42 U.S.C. § 5301. At least seventy percent of the federal funds awarded to the states pursuant to the CDBG program must be used to support persons of low and moderate income. *Id.* § 5301(c). According to the relevant federal statutory provisions, the term "State" is defined to mean "any State of the United States, or any instrumentality thereof approved by the Governor; and the Commonwealth of Puerto Rico." 42 U.S.C. §§ 5302, 5303.

At the state level, the CDBG program is administered by the North Carolina Department of Commerce, which applies to HUD for an award of CDBG funds, with the State's application being required to include "Consolidated Plans," "Annual Action Plans," and "Analyses of Impediments to Fair Housing Choice" which detail how the monies awarded pursuant to the program will be spent in compliance with federal law. After HUD has reviewed and approved the State's application and the accompanying plans submitted by the Department of Commerce, the Department of Commerce is required to submit a disbursement request to HUD associated with a specific project expenditure, at which point HUD remits the relevant funds to a "[Department of Commerce] account held by the Department of [the] State Treasurer."

The MCHBG program is administered at the federal level by the Department of Health and Human Services (DHHS), with its stated purposes being, among other

things, to provide access to quality health services for mothers and children, "to reduce infant mortality and the incidence of preventable diseases and handicapping conditions among children," to increase immunizations among children, and to "promote the health of mothers and infants by providing prenatal, delivery, and postpartum care for low income, at-risk pregnant women." 42 U.S.C. § 701. According to the relevant federal statutory provisions, the "State maternal and child health agency" of each recipient state must "prepare and submit to the Secretary [of DHHS] annual reports on its activities under this subchapter." *Id.* § 706.

In North Carolina, the MCBHG program is administered by the North Carolina Department of Health and Human Services, which applies to the federal DHHS for an award of block grant funds. After the federal DHHS has approved the State's application, the North Carolina DHHS submits a "draw down" request for funds, which are then deposited by the federal DHHS into an account held by the State Treasurer. After the North Carolina DHHS obtains access to the MCBHG funds, it disburses the funds in question to a subdivision within the agency or to a third party for use in compliance with the governing statute. The federal DHHS conducts regular audits to ensure that the North Carolina DHHS is administering the MCBHG program in accordance with the applicable provisions of federal law.

The SABG program is also administered at the federal level by the federal DHHS, with its stated purpose being to provide "community mental health services for adults with a serious mental illness and children with a serious emotional

disturbance." 42 U.S.C. § 300x(b)(1). As a precondition for being eligible to receive funds pursuant to the SABG program, recipient states must submit reports detailing the efforts that they are making to ensure that tobacco products are not sold to persons under twenty-one years of age. *Id*. § 300x-26. The SABG program, like the MCHBG program, is administered at the state level by the North Carolina DHHS, with the process for disbursing funds mirroring the process that is used in connection with the operation of the MCHBG program.

### 3. Specific Legal Claims

### a. State Constitutional Spending Rules

The appropriations clause of the North Carolina State Constitution provides that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law, and an accurate account of the receipts and expenditures of State funds shall be published annually." N.C. Const. art. V, § 7(1). In light of this constitutional provision, "[t]he power of the purse is the exclusive prerogative of the General Assembly," with the origin of the appropriations clause dating back to the time that the original state constitution was ratified in 1776.[4] John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 154 (2d ed. 2013) (Orth). In drafting the appropriations clause, the framers sought to ensure that the people,

---

[4] The North Carolina Constitution of 1776 provided that "the Governor, for the time beings shall have power to draw for and apply such sums of money as shall be voted by the general assembly, for the contingencies of government, and be accountable to them for the same." N.C. Const. of 1776, § XIX.

through their elected representatives in the General Assembly, had full and exclusive control over the allocation of the state's expenditures. *See Id.* at 154 (noting that early Americans were "acutely aware of the long struggle between the English Parliament and the Crown over the control of public finance and were determined to secure the power of the purse for their elected representatives"); *see also White v. Worth*, 126 N.C. 570, 599–600, 36 S.E. 132, 141 (1900) (Clark, J., dissenting) (stating that "[t]his power of the legislature over the public purse is the most essential one in the system of a government of the people by the people, and its abandonment under any pretext whatever can never with safety be allowed"). As a result,, the appropriations clause "states in language no man can misunderstand that the legislative power is supreme over the public purse." *State v. Davis*, 270 N.C. 1, 14, 153 S.E.2d 749, 758 (1967).

As has already been noted, the North Carolina Constitution specifically provides that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other," N.C. Const. art. I, § 6, and defines the manner in which this three-branch governmental structure should operate in the budgetary context by providing that "[t]he Governor shall prepare and recommend to the General Assembly a comprehensive budget of the anticipated revenue and proposed expenditures of the State for the ensuing fiscal period," and that "[t]he budget as enacted by the General Assembly shall be administered by the Governor." N.C. Const. art. III, § 5(3). In accordance with this

constitutionally derived budgetary process, "the governor must recommend a 'comprehensive budget,' although the legislature has no duty to adopt it as recommended," with the Governor being required to administer "[w]hatever budget is adopted." Orth at 118. As a result, while the Governor is required to make budgetary recommendations to the General Assembly and is entitled to veto budget legislation, he has no ultimate say about the contents of the final budget as adopted by the General Assembly and must faithfully administer the budget adopted by the General Assembly once it has been enacted.

The North Carolina budgetary process is further outlined in the State Budget Act, which defines "state funds" as "[a]ny moneys including federal funds deposited in the State treasury except moneys deposited in a trust fund or agency fund as described in [N.C.]G.S. [§] 143C-1-3" and directs that "[n]o State agency or non-State entity shall expend any State funds except in accordance with an act of appropriation and the requirements of the Chapter." N.C.G.S. § 143C-1-1(b), (d)(25) (2019). In addition, the State Budget Act addresses the manner in which monies derived from federal block grant programs should be handled for budgetary purposes by placing them squarely within the category of "state funds" that must be administered in accordance with the State Budget Act:

> The Secretary of each State agency that receives and administers federal Block Grant funds shall prepare and submit the agency's Block Grant plans to the Director of the Budget. The Director of the Budget shall submit the Block Grant plans to the General Assembly as part of the Recommended State Budget.

N.C.G.S. § 143C-7-2(a).  Federal grant funds, including block grant funds, have long been an important part of the state budget, as the Governor points out in his brief.[5] As the Court of Appeals noted, block grant funds have been appropriated by the General Assembly as a part of the state's constitutional budget process since at least 1981, which was the year in which the federal block grants programs at issue in this case were created.  *Cooper II*, 837 S.E.2d at 16 (citing 1981 N.C. Sess. Laws Ch. 1282 § 6).  And, as has already been noted, the General Statutes provide that "[a]ll funds belonging to the State of North Carolina, in the hands of any head of any department of the State which collects revenue for the State in any form whatsoever . . . shall daily deposit the same in some bank . . . in the name of the State Treasurer."  N.C.G.S. § 147-77 (2019).

While noting that federal grant money has long comprised a substantial portion of North Carolina's budget, the Governor attempts to distinguish the block grant funds at issue in this case by categorizing them as "custodial funds."  In support of this contention, the Governor directs our attention N.C. Const. art. IX, § 6, with his argument focusing upon that portion of the constitutional language which provides that "all other grants, gifts and devises that have been or hereafter may be

---

[5] According to the Governor, "federal grant funds have been an important part of the state budget since as early as the 1920s.  For example, the State Treasurer's report for the fiscal year ending June 30, 1922 showed nearly $400,000 in 'Special Fund Receipts' attributable to 'Federal Funds,' " citing Report of the Treasurer of North Carolina for Seven Months—December 1, 1920–June 20, 1921, and for Fiscal Year—July 1, 1921–June 30, 1992 at 12–14 , 24–25 (under "Federal Funds" headings).

made to the State, and not otherwise appropriated by the State or by the terms of the grant, gift, or devise shall be paid into the State Treasury." The Governor argues that, based upon this language, all other grants, gifts and devises that *are* otherwise appropriated by their own terms should not be paid into the State treasury.

A careful examination of the relevant constitutional language in the context in which it appears persuades us that it does not, contrary to the position espoused by the Governor, create a separate category of "custodial funds" that is not subject to legislative control. Instead, N.C. Const. art. IX, § 6, delineates four categories of monies that are contained within the "State school fund" and provides that each of these four types of funds "shall be paid into the State Treasury" and "shall be faithfully appropriated and used exclusively for establishing and maintaining a uniform system of free public schools." For this reason, we conclude that the relevant constitutional provision is intended to ensure that any general grants, gifts, and devises that are received by the State and are not intended for any other purpose shall be spent for educational purposes rather than explicitly or implicitly creating a category of "custodial funds" which are subject to executive, rather than legislative, control.

Admittedly, some categories of funds are exempt from the state budgetary process as a statutory matter, including educational funds described in N.C.G.S. § 143C-1-3(c) (providing that "funds established for The University of North Carolina and its constituent institutions pursuant to the following statutes are exempt from

Chapter 143C of the General Statutes and shall be accounted for as provided by those statutes") and the "trust funds or agency funds" mentioned in N.C.G.S. § 143C-1-1(d)(25). N.C.G.S. § 143C-1-3 defines a number of such funds including governmental, proprietary, and fiduciary and trust funds, with fiduciary funds consisting of "custodial funds" that are defined as "[a]ccounts for resources held by the reporting government in a purely custodial capacity" and that include "fiduciary activities that are not required to be reported in investment trust funds, pensions and other employee benefit trust funds, and private-purpose trust funds, as described in this section." *Id*. at § 143C-1-3(a)(8). In essence, the funds contained in this category are legally held by the state government in a fiduciary capacity while being equitably owned by the beneficiaries of the trusts or the employees who earned the funds. *Id*. at § 143C-1-3(a)(9)–(11).

According to the Governor, the block grant funds at issue in this case are "custodial funds" as defined in N.C.G.S. § 143C-1-3(a)(8). As the record clearly reflects, however, the block grant funds at issue in this case are not being held by the State in a fiduciary capacity for later distribution to their equitable owner. Instead, the relevant block grant monies have been paid by the federal government to the State to fund programs that will benefit North Carolina residents. As a result, we hold that the monies that the State derives from the relevant block grant programs are not "custodial funds" as that term is defined in N.C.G.S. § 143C-1-1(b).

In addition, the federal block grant monies at issue in this case are not custodial funds as was the case with respect to the lien against state funds that was before the Vermont Supreme Court in *Button's Estate v. Anderson*, 112 Vt. 531, 28 A.2d 404 (1942), which held that the payment of certain attorney's fees that were owed from the State of Vermont to the estate of a deceased lawyer did not require an appropriation from the state legislature given that the attorney's estate was the equitable owner of the funds and that a state statute "exempt[ed] funds held by the State in trust from the requirement that no moneys shall be paid out of the treasury except upon specific appropriation." *Id.* at 531, 28 A.2d at 409–10. In reaching this conclusion, the Vermont Supreme Court held that the monies owed to the attorney's estate were subject to the "trust fund exception" to the constitutional provision requiring state funds to be appropriated by the legislature, which

> appl[ies] only to such funds, the equitable as well as the legal rights to which are in the State. . . . That the Legislature has apparently recognized this intent is indicated by its exemptions of trust funds and rebates heretofore referred to from its acts requiring appropriations before payment. Although the legal title to the whole fund no doubt is in the State, the petitioners have equitable rights to that portion of the same which represents their fee. This part in all equity and good conscience belongs to them. They have earned it and should receive it. This portion of the fund never legally and equitably belonged to the State as part of its public funds for, at the latest, when received, the lien attached to it and remains upon it so that it is held by the State subject to the same.

*Id.* at 531, 28 A.2d at 410. Although the Governor argues in reliance upon this decision that "not all funds received by the State are part of the State treasury" and that the General Assembly should not be allowed to appropriate "custodial" funds as that term is used in *Button's Estate*, the federal block grant funds at issue in this case do not, in our opinion, implicate the "trust fund exception" given that the State holds the "equitable," as well as the "legal," rights to the block grant monies in question in this case.

In the same vein, we are not persuaded that this Court's decision in *Gardner* creates a category of funds that is owned by the State while remaining outside the State treasury and beyond the reach of the General Assembly. In reliance upon *Gardner*, the Governor argues that, in order to be part of the State treasury and subject to the General Assembly's appropriation authority, monies must be "obtained under the power of the state to enforce collection" and "placed in the hands of the state treasurer to be handled by him in accordance with the provisions of a state law." *Gardner*, 226 N.C. at 467, 38 S.E.2d at 316. In our view, the Governor's argument overlooks the fact that nothing in our decision in *Gardner* suggests that *only* money "obtained under the power of the state to enforce collection" ever enters the State treasury.

In *Gardner*, this Court considered a statute that precluded state employees from becoming members of the Local Governmental Employees' Retirement System in the event that they received benefits from another retirement system that drew its

funds "wholly or partly . . . from the treasury of the State of North Carolina." *Id.* at 466, 38 S.E.2d at 315 (quoting N.C.G.S. § 128-24(2) (1946)). In seeking a determination that he was entitled to become a member of the Local Government Employees' Retirement System despite having participated in the Law Enforcement Officers' Benefit and Retirement Fund, which was financed, in part, by a $2.00 fee collected from every convicted state criminal defendant and "paid over to the treasurer of North Carolina," i*d.* at 467, 38 S.E.2d at 315, the plaintiff argued that the $2.00 fee used to finance the Law Enforcement Officers' Benefit and Retirement Fund had not been drawn from the State treasury even though it had been paid to the State Treasurer and that such payments were, instead, "held in a special fund" by the State Treasurer for later distribution to law enforcement officers. *Id.* at 467–68, 38 S.E.2d at 316. In rejecting the plaintiff's attempt to distinguish between the "treasury" and "treasurer," this Court held that the source and purpose of the payments was not controlling, "since it is the duty of the state treasurer 'to receive all moneys which shall from time to time be paid into the treasury of this state.'" *Id.* at 468, 38 S.E.2d at 316 (quoting N.C.G.S. § 147-68 (1946)). Contrary to the plaintiff's contention, the Court held that the $2.00 fees paid to the State Treasurer for the purpose of funding the Law Enforcement Officers' Retirement and Benefit Fund were, in fact, contained within the State treasury on the grounds that

> [m]onies paid into the hands of the state treasurer by virtue of a state law become public funds for which the treasurer is responsible and may be disbursed only in accordance with legislative authority. A treasurer is one in

> charge of a treasury, and a treasury is a place where public funds are deposited, kept and disbursed.

*Id*. As a result, rather than limiting the definition of "state treasury" to a location in which the public funds raised by the state's own tax and other revenue-generating measures are collected and maintained, our decision in *Gardner* expanded the definition of the State treasury to include any funds received by the State Treasurer in accordance with a state law regardless of the capacity in which those funds are being held.

In addition, we are not persuaded by the Governor's contention that the Court of Appeals' reference to N.C.G.S. § 147-77 impermissibly allows the General Assembly to define the meaning of the constitution. Although he has not challenged the constitutionality of N.C.G.S. § 147-77, the Governor does contend that the Court of Appeals erroneously held that the General Assembly's decision to appropriate funds derived from the relevant block grant programs was consistent with the principles enunciated in *Gardner* on the theory that those funds had entered the State treasury pursuant to N.C.G.S. § 147-77, which provides that all funds "belonging to the state of North Carolina" must be deposited in the name of the State Treasurer. We do not find this argument to be persuasive for several reasons.

As an initial matter, we do not, for the reasons set forth above, read *Gardner* as holding that the State treasury consists of nothing more than the proceeds of state taxes, penalties, fines, and other revenue-generating devices. In addition, we do not believe that N.C.G.S. § 147-77 allows the General Assembly to define the "State

treasury" or the "State Treasurer" as a constitutional matter and acknowledge that the terms and expressions used in the State constitution must necessarily have a meaning separate and apart from the manner in which the General Assembly seeks to construe them. On the other hand, an act of the General Assembly is constitutional if "the Constitution contains no prohibition against it." *Town of Boone*, 369 N.C. at 130, 794 S.E.2d at 714. In our view, rather than conflicting with the relevant constitutional provisions, N.C.G.S. § 147-77 is consistent with the constitutional mandate that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law" by directing that all funds "belonging to the State of North Carolina" must be deposited into the State treasury. In other words, rather than being repugnant to any provision of the State constitution, N.C.G.S. § 147-77 builds upon and implements the definitions of the State treasury and the State Treasurer found in the State constitution. *See Baker v. Martin*, 330 N.C. at 337, 410 S.E.2d at 890 (concluding that this Court "will find acts of the legislature repugnant to the Constitution only 'if the repugnance does really exist and is plain' ") (quoting *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989)).

After a careful review of the relevant legal authorities, we have been unable to find any provision of the North Carolina State Constitution that creates a category of money that might possibly include the federal block grant monies that lies outside the State treasury or the General Assembly's appropriation authority. The General Assembly enacted the state budget embodied in Session Law 2017-57 in accordance

with N.C. Const. art. III, § 5, as it was required to do so. In enacting the annual State budget, the General Assembly was fully entitled to disagree with the recommendations relating to the manner in which the funds derived from the relevant federal block grant programs should be spent set out in the Governor's recommended budget given that "the legislature has no duty to adopt [the budget] as recommended." Orth at 118. Although the General Assembly did not, as a matter of federal law, have the authority to appropriate the federal block grant monies at issue in this case for a purpose that was not authorized under the relevant block grant statutes, the remedy for any such conduct would be for the federal government to stop payment of block grant monies to the State. See 42 U.S.C. § 5311 (providing that, "[i]f the Secretary finds . . . that a recipient of assistance under this chapter has failed to comply substantially with any provision of this chapter, the Secretary, until he is satisfied that there is no longer any such failure to comply, shall terminate payments to the recipient under this chapter."); see also 42 U.S.C. § 706(b)(2) (providing that "[t]he Secretary may, after notice and opportunity for a hearing, withhold payment of funds to any State which is not using its allotment under this subchapter in accordance with this subchapter.").[6] As a result, we hold that the block grant funds at issue in this case are contained in the State treasury and subject to the General Assembly's appropriations authority.

---

[6] The Governor does not argue that the General Assembly appropriated the relevant block grant monies in a manner that violated the underlying federal statutes.

b. Separation of Powers

As we have already noted, the North Carolina State Constitution contains an explicit separation of powers clause, N.C. Const. art. I, § 6, and directs the Governor to "take care that the laws be faithfully executed," N.C. Const art. III, § 5(4). "[T]he separation of powers doctrine is well established under North Carolina law." *Bacon v. Lee*, 353 N.C. 696, 715, 549 S.E.2d 840, 853 (2001) (citing, *inter alia, State ex rel. Wallace v. Bone*, 304 N.C. 591, 609, 286 S.E.2d 79, 89 (1982)). A violation of the separation of powers clause occurs when one branch of government attempts to exercise the constitutional powers of another or when "the actions of one branch prevent another branch from performing its constitutional duties." *McCrory*, 368 N.C. at 645, 781 S.E.2d at 256. In determining whether a separation of powers violation has occurred, this Court must "examine the text of the constitution, our constitutional history, and this Court's separation of powers precedents." *Id.* at 644, 781 S.E.2d at 255. More specifically, when analyzing a claim that the legislative branch has attempted to usurp the executive branch's constitutional authority, we examine whether the legislature has "unreasonably disrupt[ed] a core power of the executive." *Id.* at 645, 781 S.E.2d 256 (quoting *Bacon*, 353 N.C. at 715, 549 S.E.2d at 853).

We have examined whether the General Assembly has unconstitutionally attempted to interfere with the authority of the executive branch to faithfully execute the law in several relatively recent cases. In *State ex rel. McCrory v. Berger*, this

Court held that the General Assembly had violated the separation of powers clause when it enacted a statute giving itself the authority to appoint a majority of voting members to three state commissions, each of which were determined to be "executive in character," given that they were responsible for executing various state environmental laws by promulgating oil and gas rules, issuing mining permits, and deciding whether surface coal ash impoundments should be closed. 368 N.C. at 645–47, 781 S.E.2d at 256–257. In reaching this result, we reasoned that the Governor needed to have "enough control" over these executive commissions in order to fulfill his constitutional duty to faithfully execute the laws and that the relevant statutory provisions impermissibly impaired his ability to do so by preventing him from appointing a majority of the commissions' members, restricting him from removing any of the members in the absence of a showing of cause, and allowing the commissions to operate outside of his supervision and control. *Id*. at 646, 781 S.E.2d at 256–57. Similarly, in *State ex rel. Wallace v. Bone*, this Court held that the enactment of a statute appointing sitting legislators to an executive agency charged with issuing permits and investigating issues arising from the administration of air and water pollution laws constituted an impermissible encroachment upon the Governor's authority to see that the laws were faithfully executed. 304 N.C. 591, 608–09, 286 S.E.2d 79, 88–89 (1982). In reaching this conclusion, the Court noted that the enforcement of environmental laws bore no relation "to the function of the legislative branch of government, which is to make laws." *Id*. at 608, 286 S.E.2d at

88. As a result, this Court has not hesitated to step in to preclude impermissible violations of the separation of powers and faithful execution clauses in appropriate instances.

In urging us to determine that this case involves a separation of powers violation, the Governor asserts that this Court's decision in *Cooper I* establishes that the "faithful execution" clause found in N.C. Const. art. III, § 5(4) "contemplate[s] that the Governor will have the ability to affirmatively implement the policy decisions" made by the "executive branch agencies subject to his or her control." 370 N.C. at 415, 809 S.E.2d at 112. In *Cooper I*, the Court held that legislation creating a Bipartisan State Board of Elections and Ethics Enforcement caused a separation of powers violation, *id.* at 422, 809 S.E.2d at 116, by requiring the Governor to appoint eight members to that board, with four appointments to be made from two lists prepared by "the State party chair[s] of the two political parties with the highest number of registered affiliates," none of whom could be removed in the absence of "misfeasance, malfeasance, or nonfeasance," *id.* at 396, 809 S.E.2d at 100–01, and precluding the appointment of a new Executive Director until approximately two years had elapsed. *Id.* at 416, 809 S.E.2d at 112. After concluding that the agency in question "clearly perform[ed] primarily executive, rather than legislative or judicial, functions," given its responsibility for executing laws relating to "elections, campaign finance, lobbying, and ethics," *id.* at 415, 809 S.E.2d at 112, we found that the General Assembly had unconstitutionally interfered with the Governor's duty to ensure that

the laws were faithfully executed by requiring him to "appoint half of the commission members from a list of nominees consisting of individuals who are, in all likelihood, not supportive of, if not openly opposed to, his or her policy preferences" while limiting his ability to supervise the agency and remove its members. *Id.* at 418, 809 S.E.2d at 114.

Although the Court did refer to the Governor's "interstitial" policymaking authority in the course of invalidating the statutory provisions governing the Bipartisan State Board, the authority to which we referred in *Cooper I* was delegated to, rather than inherently possessed by, the Governor. In other words, our decision in *Cooper I* held that, having delegated "interstitial" discretionary authority to make policy decisions to the executive branch rather than making those policy decisions itself, the General Assembly was not then entitled to "impermissibly interfere" with the manner in which the Governor opted to execute the authority that had been granted to the executive branch by the General Assembly. *Id.* at 422, 809 S.E.2d at 116. In the present instance, however, the General Assembly has not delegated the authority to determine how the relevant federal block money should be spent to anyone; instead, it made the underlying policy decisions itself by appropriating the monies made available to the State through the relevant federal block grant programs through the enactment of legislation establishing the annual state budget. As a result, nothing in *Cooper I* provides any support for the Governor's state constitutional separation of powers claim.

In addition, the Governor argues that his duty to faithfully execute the laws includes an obligation to ensure that the monies received by the State from the relevant federal block grant programs are spent appropriately on the theory that his duty to faithfully execute the laws "includes not only the execution of state laws, but also the responsibility to enforce *federal* laws and regulations." In other words, the Governor argues that his obligation to ensure that the distribution of federal block grant monies satisfies "the requirements and conditions" of the federal statutes leaves "no room" for appropriation of the funds in question by the General Assembly. Although the Governor's argument has some surface appeal, it overlooks the fact that nothing in the relevant federal statutory provisions prescribes the manner in which each individual state must determine how the relevant federal block grant monies are distributed. Instead, the applicable federal statutes leave that issue for determination under state law. And, as we have already established, the North Carolina State Constitution provides that the appropriation authority lies with the General Assembly rather than with the Governor. *See Rhyne,*, 358 N.C. at 169–70, 594 S.E.2d at 8–9 (determining that the General Assembly was the "appropriate forum" for implementing policy changes given that it was "well equipped to weigh all the factors surrounding a particular problem, balance competing interests, provide an appropriate forum for a full and open debate, and address all of the issues at one time" (cleaned up)).

Finally, the Governor relies upon the decision of the Court of Appeals in *Richmond Cty. Bd. of Educ. v. Cowell*, 254 N.C. App. 42, 803 S.E.2d 27 (2017), in support of his separation of powers argument. In that case, the Court of Appeals held, as a general proposition, that the General Assembly is required to "appropriate funds" and the executive branch is responsible for implementing the relevant legislative decision by disbursing the money in accordance with the General Assembly's instructions. 254 N.C. App. 422, 423, 803 S.E.2d 27, 29 (2017). In addition, the Court of Appeals stated that "[a]ppropriating money from the State treasury is a power vested exclusively in the legislative branch" and that the judicial branch lacked the authority to "order State officials to draw money from the State treasury." *Id.* at 426–27, 803 S.E.2d at 31. Similarly, while the executive branch does have the authority under the relevant provisions of the North Carolina State Constitution to faithfully execute the laws by submitting disbursement requests to the federal government and paying out the block grant funds in a lawful way, nothing in either state or federal law makes the executive branch responsible for determining how the monies derived from the relevant federal block grant programs should be spent. As a result, for all of these reasons, we hold that the enactment of Session Law 2017-57 did not violate the separation of powers or faithful execution clauses of the North Carolina State Constitution.

### c. "Custodial Funds"

Finally, the Governor urges us to adopt the "custodial fund" test that has been adopted in several other jurisdictions, citing six cases in which the appellate courts in other states have found that federal grant money was not subject to the state legislature's appropriation authority. *See Lamm I*, 700 P.2d at 524–25 (Colo. 1985); *Opinion of the Justices to the Senate*, 375 Mass. at 854, 378 N.E.2d at 436; *In re Okla. ex rel. Dep't of Transp.*, 646 P.2d at 609–10; *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 370, 524 P.2d 975, 986 (1974); *Navajo Tribe v. Ariz. Dep't of Admin.*, 111 Ariz. 279, 528 P.2d 623 (1974); *Tiger Stadium Fan Club v. Governor*, 217 Mich. App. 439, 553 N.W.2d 7 (1996). However, as the Governor candidly notes in his brief, there are other decisions around the country that reach a different result and the decisions upon which he relies were rendered under constitutional provisions and traditions that differ from those that exist in North Carolina. In light of our inability to find anything in the language or history of the North Carolina State Constitution that provides any basis for recognizing the existence of such a test, we decline to accept the Governor's invitation to adopt the "custodial funds" test or to hold that the executive branch, rather than the legislative branch, has the constitutional authority to determine the manner in which the funds derived from the relevant block grant programs are distributed in North Carolina.

## III. Conclusion

Thus, for the reasons set forth above, we hold that the Court of Appeals did not err by upholding the trial court's decision to grant the legislative defendants' motion

for judgment on the pleadings and to dismiss the two claims that are at issue in this

case.  As a result, the Court of Appeals' decision is affirmed.

AFFIRMED.

Justice EARLS dissenting.

By this appeal, the Governor seeks to do something which should not be controversial: to ensure that funds applied for by state executive agencies and obtained through federal programs are spent consistently with the applications for those funds. The Governor, having obtained federal funds through three block grant programs, submitted a proposed budget which sought to direct those funds in compliance with the State Budget Act. *See* N.C.G.S. § 143C-7-2(a) (2019). However, the General Assembly passed a budget, over the Governor's veto, which redirected certain portions of those funds, as the majority has described. The General Assembly exceeded its authority when it did so. Because, in my view, the General Assembly encroached on the Governor's authority in violation of our constitution's separation of powers clause, I respectfully dissent.

The Governor, through state executive agencies, administers all three of the federal block grants at issue in this case. Those programs are the Community Development Block Grant (CDBG) program, the Substance Abuse Block Grant (SABG) program, and the Maternal and Child Health Block Grant (MCHBG) program. *Cooper v. Berger*, 837 S.E.2d 7, 10 (N.C. Ct. App. 2019) (*Cooper II*). Each program is administered at the state level by an executive agency. The CDBG program is administered by the North Carolina Department of Commerce (DOC). The

MCHBG and SABG programs are both administered by the North Carolina Department of Health and Human Services (NC DHHS).

All three of the block grant programs work similarly. In each case, the state executive agency administering the program applies to its federal counterpart and requests funding. In each case, the funds are held by the federal government until they are ready to be used. In each case, the approved funds are transmitted from the federal agency to the state agency, and then to the subgrantee. As a result, the federal block grant funds do not sit in state accounts ready to be used for the state's general purposes. Instead, they pass through state accounts on their way from the federal government to the specific subgrantees for which they are earmarked.

Significantly, in each case the executive agencies administer the federal block grant programs pursuant to either state or federal legislative enactment. For example, DOC's administration of the CDBG program is pursuant to discretionary authority laid out in the statute that describes its functions. *See* N.C.G.S. § 143B-431(d) ("The Department of Commerce, with the approval of the Governor, may apply for and accept grants from the federal government and its agencies . . . and may comply with the terms, conditions, and limitations of such grants in order to accomplish the Department's purposes."). Similarly, NC DHHS administers the MCHBG program pursuant to federal legislative authority. *See* 42 U.S.C. § 709(b). Likewise, NC DHHS administers the SABG program pursuant to federal legislative authority. *See* 42 U.S.C. § 300x-32(b)(1)(A)(i) (requiring a "single State agency" be

responsible for administering the program); *see also* N.C.G.S. § 143C-7-2(a) (referring to "each State agency that receives and administers federal Block Grant funds").

Against this backdrop, the General Assembly's diversion of a portion of the block grant funds toward its own priorities was an unconstitutional encroachment on the Governor's authority, in violation of the separation of powers principles laid out in our constitution. "The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. Where "one branch exercises power that the constitution vests exclusively in another branch," we have stated that it is "[t]he clearest violation of the separation of powers clause." *State ex rel. McCrory v. Berger*, 368 N.C. 633, 645, 781 S.E.2d 248, 256 (2016).

Here, the disposition of the block grant funds is firmly within the Governor's authority to determine. The Governor is required by our constitution to "take care that the laws be faithfully executed." N.C. Const. art. III, § 5. This provision both "contemplat[es] that the Governor will have the ability to preclude others from forcing him or her to execute the laws in a manner to which he or she objects" and "that the Governor will have the ability to affirmatively implement the policy decisions that executive branch agencies subject to his or her control are allowed, through delegation from the General Assembly to make." *Cooper v. Berger*, 370 N.C. 392, 415, 809 S.E.2d 98, 111–12 (2018) (*Cooper I*). As to the substance of the Governor's duty, it extends to upholding both state and federal law. *See, e.g.*, N.C. Const. art. III, § 4

("The Governor, before entering upon the duties of his office, shall, before any Justice of the Supreme Court, take an oath or affirmation that he will support the Constitution and laws of the United States and of the State of North Carolina, and that he will faithfully perform the duties pertaining to the office of Governor.").

The Governor, then, is required to give effect to the federal and state laws pertaining to the federal block grants, and the General Assembly violates the separation of powers when it either (a) attempts to usurp that role, or (b) prevents the Governor from implementing policy decisions which are granted to executive branch agencies by statute. The General Assembly has done both. For each of the federal block grants, discretionary spending decisions are delegated to the Governor. As to the CDBG program, DOC is explicitly authorized to "apply for and accept grants from the federal government" and to use those grants "in order to accomplish the Department's purposes." N.C.G.S. § 143B-431(d). As to the MCHBG program, NC DHHS is charged with submitting an application to the federal government which states how the block grant funds will be used. 42 U.S.C. § 705(a); *id.* § 709(b). The funds issued under the program must then be spent in accordance with that application. *Id.* § 704(a). Finally, as to the SABG program, NC DHHS, as North Carolina's dedicated agency, is charged with "administration of the program." *Id.* § 300x-32(b)(1)(A)(i). Furthermore, the statute requires that the "chief executive officer of the State" certify covenants between the state and the federal government regarding certain program requirements. *Id.* § 300x-32(a)(3).

For each program, it is the Governor's duty to ensure compliance with the law. However, by subverting the Governor's funding priorities where discretion is placed in the executive, and by obstructing the Governor's ability to ensure that expenditures match requests, inhibiting compliance with the reporting requirements of the federal programs, the General Assembly both frustrates the Governor's "ability to preclude others from forcing [him] to execute the laws in a manner to which [he] objects" and the Governor's "ability to affirmatively implement the policy decisions" allowed through statutory enactment. *See Cooper I*, 370 N.C. at 415, 809 S.E.2d at 112.

By contrast, the disposition of these funds is not within the General Assembly's authority. The General Assembly's supreme authority over the public purse derives from (current) Article V, Section 7, of the North Carolina State Constitution, which states that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law." N.C. Const. art. V, § 7(1); *see State v. Davis*, 270 N.C. 1, 14, 153 S.E.2d 749, 758 (1967). As a result, money must be in the state treasury to trigger the legislature's appropriations power. However, the federal block grants are not part of the state treasury.

The state treasury consists of funds obtained by the state pursuant to its collection powers. *Gardner v. Bd. of Trs.*, 226 N.C. 465, 467, 38 S.E.2d 314, 316 (1946) (stating that money is part of "the treasury of the state" where it "is obtained under the power of the State to enforce collection, and is placed in the hands of the State

Treasurer to be handled by him in accordance with the provisions of a State law"). In *Gardner*, we considered whether a city policeman was eligible to join the Local Governmental Employees' Retirement System. *Id.* at 466, 38 S.E.2d at 315. At the time, state law excluded from that retirement system persons receiving retirement allowances from "funds drawn from the treasury of the State of North Carolina." *Id.* We concluded that the police officer, who was receiving retirement benefits funded partly by a two-dollar charge appended to every criminal conviction, *id.* at 467, 38 S.E.2d at 315, could not belong to both retirement systems. *Id.* at 468, 38 S.E.2d at 316. Central to our analysis was our observation, referring to the conviction-funded retirement system, that "[t]he money is obtained under the power of the State to enforce collection, and is placed in the hands of the State Treasurer to be handled by him in accordance with the provisions of a State law." *Id.* at 467, 38 S.E.2d at 316. It was of no moment, we determined, that the funds were not "derived from general taxation." *Id.* Instead, because the funds were collected "by virtue of a State law" and came "into the hands of the State Treasurer," they were part of the state treasury. *Id.*

The funds at issue in this case, of course, were not "obtained under the power of the State to enforce collection." *See id.* Instead, they were requested by state executive branch agencies and received directly from the federal government. As a result, they are outside of the General Assembly's appropriations power because they were not part of the state treasury. N.C. Const. art. V, § 7(1) ("No money shall be drawn from the State treasury but in consequence of appropriations made by

law . . . ."); *see Davis*, 270 N.C. 1, 14, 153 S.E.2d 749, 758 (stating that the General Assembly's supreme legislative power over the public purse derives from this provision, formerly N.C. Const. art. XIV, § 3).

The majority fundamentally misunderstands our decision in *Gardner*, claiming that the decision expanded the definition of state treasury to include any funds held by the state. This interpretation ignores that all of the funds in *Gardner*, which we held were part of the state treasury, were collected pursuant to state law. *Gardner*, 226 N.C. at 467, 38 S.E.2d at 315. The distinction in *Gardner* was between funds collected pursuant to the general taxing power and funds collected pursuant to other state law. *Id.* at 467, 38 S.E.2d at 315–16. All funds "obtained under the power of the State to enforce collection" and "placed in the hands of the State Treasurer to be handled by him in accordance with the provisions of a State law" are part of the state treasury. *Id.* at 467, 38 S.E.2d at 316. This is consistent with our observation that "[t]he power to appropriate money *from* the public treasury is no greater than the power to levy the tax which put the money in the treasury." *Maready v. City of Winston-Salem*, 342 N.C. 708, 714, 467 S.E.2d 615, 619 (1996) (quoting *Mitchell v. North Carolina Indus. Dev. Fin. Auth.*, 273 N.C. 137, 143, 159 S.E.2d 745, 749–50 (1968)). The General Assembly's power to appropriate funds is limited by its power to put funds into the treasury. As a result, the General Assembly has no power over funds that it did not collect.

The idea that some funds held by the state are not subject to the legislative appropriations power is enforced in our state constitution. For example, article IX, section 6 exempts from the General Assembly's appropriation power "grants, gifts, and devises" which have been "made to the State" and have been "appropriated . . . by the terms of the grant, gift, or devise." N.C. Const. art. IX, § 6. While the majority observes, correctly, that this section ensures that gifts not intended for another purpose are spent on education, the majority wholly fails to address the fact that our state constitution explicitly refers to funds held by the state in a custodial capacity, and excludes those funds from the power of legislative appropriations.

Moreover, the status of the block grant funds as "custodial funds" is affirmed by the "information about the grants, their purposes, for whom they are intended, and the conditions placed on them by Congress." *See In re Separation of Powers*, 305 N.C. 767, 295 S.E.2d 589 (1982). As noted previously, the block grant funds are held, not in state accounts, but by the federal government until they are ready to be used. The record evidence indicates that they then pass through the state executive agency on their way to their ultimate recipient, the subgrantee. Of particular significance is the fact that the federal government exercises substantial oversight over the block grant funds. For example, in February 2017, HUD wrote to DOC to express concern that CDBG funds were being spent in accordance with the plan that DOC had sent to HUD. Similarly, Congress requires that funds issued from the MCHBG program be spent consistently with the funding application submitted by NC DHHS. 42 U.S.C.

§ 704(a). The ultimate purpose of the block grant funds, the insignificant amount of time spent in state accounts, and the federal oversight mandated by Congress all suggest that the funds are not generally for the benefit of the state, but are instead temporarily held by the state for the benefit of others, making them custodial funds not subject to the legislative power of appropriation.

Such a result does not give the executive branch unlimited authority over all federal funds. The majority notes that block grant programs and other federal grants made up 28.4% of the state budget in 2017. However, where Congress specifically delineates legislative authority over federal funds, the General Assembly has an independent basis for exercising power over them—the terms of the grant require it. In that case, there is no need for the legislature to resort to its constitutional authority over the treasury.

The conclusion that these particular funds are not part of the state treasury is consistent with the outcomes reached by a number of our sister courts. For example, the constitution of the State of Colorado provides that "[n]o moneys in the state treasury shall be disbursed therefrom by the treasurer except upon appropriations made by law, or otherwise authorized by law, and any amount disbursed shall be substantiated by vouchers signed and approved in the manner prescribed by law." Colo. Const. art. V, § 33. However, the Colorado Supreme Court determined that "[t]he power of the General Assembly to make appropriations relates to state funds" and that "federal contributions are not the subject of the appropriative power of the

legislature. *MacManus v. Love*, 499 P.2d 609, 610 (Colo. 1972). In a later case involving federal block grants, that Court determined, after reviewing the structure of the federal block grant programs at issue, that the block grants not requiring matching funds from the state were subject to executive, not legislative authority. *Colo. Gen. Assembly v. Lamm*, 738 P.2d 1156, 1173 (Colo. 1987) (*Lamm II*).

Similarly, the constitution of New Mexico provides that "money shall be paid out of the treasury only upon appropriations made by the legislature." N.M. Const. art. IV, § 30. Even so, the New Mexico Supreme Court held that the legislature "has no power to appropriate and thereby endeavor to control the manner and extent of the use or expenditure of Federal funds" which had been granted to the state's universities. *State ex rel. Sego v. Kirkpatrick*, 1974-NMSC-059, ¶ 51, 86 N.M. 359, 370, 524 P.2d 975, 986.

The majority dismisses these precedents as not relevant on the ground that "these decisions were rendered under constitutional provisions and traditions that differ from those that exist in North Carolina." This facile rationale fails to explain why the statement in our constitution that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law", N.C. Const. Art. V, §7, should mean something different from the statement that "money shall be paid out of the treasury only upon appropriations made by the legislature." N.M. Const. art. IV, §30. It further fails to explain what about our state traditions would mandate a

different interpretation. At the end of the day, this is about whether this Court will honor the principles of separation of powers set out in our state constitution.

The particular federal block grants at issue in this case are appropriately subject to the discretion of the executive. In reaching the opposite conclusion, the majority ignores our precedent defining the extent of executive authority in the face of delegated authority from our state and federal legislatures, misinterprets our prior caselaw regarding the limits on legislative authority, and ignores the guidance of other courts who have faced this same issue. While doing so, the majority permits the legislature to upset settled expectations between this state and the federal government about how the block grant programs will be used and threatens the independence of the separate branches of government in this state. I therefore respectfully dissent.